Filed 6/3/16  P. v. Thornton CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>MICHAEL KEVIN THORNTON,<br><br>        Defendant and Appellant. | A140436<br><br>(Solano County<br>Super. Ct. No. VCR218605) |

Michael Kevin Thornton (appellant) appeals from a judgment entered after a jury found him not guilty of first degree burglary and guilty of being in receipt of stolen property, and the trial court sentenced him to three years of probation.  He contends the court:  (1) erred in failing to give a unanimity instruction that the receipt of stolen property charge was based solely on evidence of property belonging to one of two victims; and (2) improperly discharged a sitting juror.  We reject the contentions and affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

At about 6:00 a.m. on August 2, 2013, the sun had already risen, and it was light out.  Vallejo Police Officer Theodore Postolaki was patrolling a residential area in a marked police car when he noticed a man, later identified as appellant, and a woman, later identified as Stacey Blanton, walking diagonally in the street, away from a house whose garage was completely open.  Appellant's arms were balanced out and bent at the elbow, and he "appeared to have something in front of him, how a person looks when they're carrying something."  Appellant quickly looked over his left shoulder as Postolaki

1

approached in his police car. Appellant had a "very slight verbal exchange" with Blanton, then picked up his pace and quickly crossed the street. Postolaki continued to approach, at which point appellant stepped behind a parked truck and ducked and paused there for a few seconds.

As Postolaki drove even closer, he noticed appellant was no longer carrying anything and was "swinging his arms and in like full stride walking." When Postolaki caught up with appellant and asked what he was doing, appellant said he was out for a walk. Postolaki noticed that appellant was not wearing workout clothing but was wearing jeans, a cap, and a thermal shirt. His shirt sleeves were pulled down and covered his hands, and were dirty as if he had done something with his hands. Postolaki ordered appellant to stop but he continued to walk. When Postolaki asked a second time, appellant complied. Appellant reached into his left pants pocket, and in response, Postolaki "challenged him with [his] duty weapon from inside [his] car."

When Postolaki eventually handcuffed appellant, appellant "nervously began talking" and volunteered that he and Blanton—his girlfriend—were on their way to a restaurant called Scotty's. Postolaki noted that appellant and Blanton had not been walking towards Scotty's and the "route that [they were] walking was by far the most indirect route that you'd take to go to Scotty's." The route led to a dead end, with no pedestrian walkway. The way they had been walking would have required them to jump over a fence and commit trespass in order to get to the restaurant.

Postolaki called for backup and began investigating. He searched appellant and found a flashlight in his left pants pocket. He searched Blanton and kept her isolated, away from appellant. As Postolaki looked around, he found a white box on a lawn where he had seen appellant duck and pause behind a parked truck. There was dew on the lawn and on the cars that were parked on the street, but the box appeared "unweathered," which led Postolaki to believe it had not "sat overnight or anything to that effect." Inside the box was a Skilsaw, which is an "[e]lectrically-powered wood-cutting saw, usually seven to eight inch blade, used for basic construction."

2

After additional officers arrived at the scene, Postolaki went to the house from which he had first seen appellant and Blanton walking away. The garage of the house was still wide open. Postolaki knocked on the front door, and a woman who appeared to have just gotten up for the day answered the door and seemed surprised to see a police officer. Postolaki asked the woman, later identified as Kelly Randall, about the open garage, and Randall said she had forgotten to close it the previous night. She and Postolaki went to her garage to see if anything was missing. She looked around and noticed that her Skilsaw, a sander, an electric cordless drill, and a dog grooming bag were gone. She also looked inside her car, which was parked inside the garage, and noticed that her work bag, which she typically kept on the passenger front seat, was missing. Inside the bag were "things like a stethoscope and scissors and papers" and her nurse identification badge. Randall did not know appellant or Blanton and had not given either of them permission to be in her garage.

Postolaki then searched Blanton's car—an older gold colored GMC Suburban (the Suburban)—that was parked nearby. Inside he found a bag containing a sander, a bag containing a power drill, a dog grooming bag containing various grooming equipment, and a bag containing stethoscopes, employee identification from Kaiser Hospital, and a security fob for the Kaiser Hospital pediatric wing. Postolaki also found a burgundy purse containing various personal documents, which he later discovered belonged to a woman named Yolanda Ramirez who lived about two blocks away from where appellant and Blanton were first seen walking. Ramirez had left her purse in the back seat of her car, which she had parked in her driveway at approximately 5:30 p.m. on August 1, 2013. She could not remember whether she locked her car before going inside her house that evening. She did not know appellant or Blanton and had not given either of them permission to take her purse.

The jury found appellant not guilty of first degree burglary and found him guilty of receiving stolen property. The trial court sentenced him to three years of probation.

3

## DISCUSSION

### 1. Jury Instructions

### a. Background

After all witnesses testified, the parties discussed whether the trial court should instruct the jury with CALCRIM 3500 regarding unanimity and CALCRIM 3516, governing circumstances where a defendant is charged in the alternative with multiple counts stemming from a single event.[1]  Defense counsel stated that her "initial reaction is that we need to have a unanimity instruction in 3500" because "there has to be an agreement as to what property is stolen."  The court responded, "I don't know if it matters whether it was Ms. Randall's property or Ms. Ramirez's property . . .  There was a huge pot of stolen property, and the issue is what he knew, and so I would not be inclined to give a unanimity instruction, but my mind can be changed if you make a compelling-enough argument."

When discussions resumed the next day, the prosecutor said he had decided to proceed on count 2 as to Ramirez's property only:  "my theory is, he went and stole the items from Ms. Randall's garage, and if they find him guilty of that, then there's also the items from Ms. Ramirez to consider as to Count 2."  He agreed that even if the jury found appellant not guilty of burglary, he was still "contending that as to Count 2, the only property that we're talking about is Ms. Ramirez's property."[2]  He said he would argue to the jury that count 2 was based on Ramirez's property.

_____

[1]CALCRIM 3500 provides:  "The defendant is charged with [the alleged offense] . . . [¶]  The People have presented evidence of more than one act to prove that the defendant committed this offense.  You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act (he/she) committed."  CALCRIM 3516 provides:  "[The defendant is charged in Count __ with [the alleged offense] and in Count __ with [the alleged offense].  These are alternative charges.  If you find the defendant guilty of one of these charges, you must find (him/her) not guilty of the other.  You cannot find the defendant guilty of both.]"  (Some bolding omitted.)

[2]It appears the prosecutor's decision was based in part on his erroneous belief that appellant could not be convicted of both burglarizing Randall's garage and receiving Randall's stolen property.  Although a defendant may not lawfully be convicted of both

4

After the prosecutor made this election, defense counsel stated, "If that's the case, then I don't know that we need 3516 or 3500, those instructions to be given. If the People are electing to just pursue count 2 with regard to the Ramirez property, there's no need for a unanimity because there's only one set of property, and then I don't think there's any need for 3516 because they're not alleging receiving stolen property with regard to . . . Mrs. Randall's property." The prosecutor agreed, and added, "Just so I'm clear, though: I am going to argue that evidence [of the stolen items] found in the Suburban is evidence that this defendant took it. Does that make sense?" The court responded, "the law does permit you to argue that."

During closing, the prosecutor argued the evidence would show "the defendant is guilty of burglary of [Randall's house], and also guilty of receiving stolen property, the property from Ms. Ramirez that was located in the Suburban." The prosecutor argued as to count 1 that appellant was guilty of burglary based on the direction he was walking and where he said he was headed, the location of the box with the Skilsaw and of the Suburban containing Randall's property, Randall's testimony that she did not close her garage door, appellant's behavior toward Postolaki, his clothing, the dirt on his sleeves, and the flashlight in his pocket. He stated, "In order to prove the theft, the People must prove that the defendant took possession of property owned by someone else. [¶] Here, that's Ms. Randall's property."

The prosecutor continued: "Now, you hear about Count 2, which is receiving stolen property. That's basically toward the property of Ms. Ramirez that was located in the car. That property, the defendant did not have her permission to have, and it was strewn about with property that belonged to Ms. Randall. The fact that . . . those two people's property are bunched together in a car, the fact that they were taken . . . around the same time, the fact that they're in the same neighborhood, and the fact that the

_theft_ of property and receipt of that stolen property (*People v. Jaramillo* (1976) 16 Cal.3d 752, 757), it is settled that "a defendant may lawfully be convicted of *burglary* and of receiving property that he stole during the burglary" (*People v. Allen* (1999) 21 Cal.4th 846, 866, italics added).

opportunities were there. [¶] Again, Ms. Ramirez doesn't recall whether or not she locked her car door. Odds are, she didn't because there's no evidence of any of her testimony about a window being broken or anything like that. We just know that her car was parked in the driveway and those items were taken."

Defense counsel argued appellant was in "the wrong place at the wrong time," and that the police, which prematurely determined appellant had committed a crime, "utterly failed to investigate." As to the burglary charge, she noted the lack of evidence relating to the box containing the Skilsaw, stating, "think about this. [Postolaki] took "twenty-plus pictures" of various items, including "everything in the car . . . but . . . you will not see one picture of this box that Mr. Thornton was allegedly carrying . . . ." She stated the police failed to dust the Skilsaw or any of the other items belonging to Randall for fingerprints. She argued there was not "one piece of evidence" that appellant ever entered Randall's garage.

As to count 2, defense counsel argued: "Now, Count 2 is receiving stolen property; receiving stolen property belonging to Ms. Ramirez. Now the prosecution is required to prove, one, that Mr. Thornton possessed Ms. Ramirez's property, which they have not done. They have to prove, two, that Mr. Thornton knew that Ms. Ramirez's property was stolen . . . . They haven't proven either. They haven't even proven that Mr. Thornton knew Ms. Ramirez's property was in Ms. Blanton's car. They haven't proven that Mr. Thornton was ever in Ms. Blanton's vehicle. They haven't proven that Mr. Thornton knew that Ms. Ramirez's property was stolen." "I'm confident that the prosecution has not presented any evidence that Mr. Thornton possessed Ms. Ramirez's property, or that Mr. Thornton knew Ms. Ramirez's property was stolen, or that Mr. Thornton is guilty of receiving stolen property."

On rebuttal, the prosecutor focused on the burglary count and argued the police investigation was sound. He asked the jury to use "common sense" and asked, "Why carry a flashlight [when it is daylight]? Why cover your hands? Why say you're going to go to Scotty's when you are going to hop two fences and trespass into people's yards and take the most indirect route you can? And why go for a walk with Ms. Blanton?

6

They're going for a walk because they're looking for opportunities to break into houses . . . ." He concluded: "All the pieces of this puzzle show that he broke into that garage, (indicating), show that he took items belonging to Ms. Ramirez. [¶] I'm confident, if you look at the evidence and examine it closely, it all will take you to one conclusion: That he's guilty."

### b. Contention

Appellant contends the trial court erred in failing to give a unanimity instruction that the receipt of stolen property charge was based solely on evidence of property belonging to Ramirez, i.e., the burgundy purse inside the Suburban, and not on evidence of the Skilsaw or any other property belonging to Randall.[3] The Attorney General (respondent) argues appellant invited the error because defense counsel stipulated there was "no need" for unanimity or alternative charge instructions. Respondent also argues the court was not required to give an instruction, and that any failure to give the instruction was harmless. Assuming, without deciding, that the invited error doctrine does not apply, we conclude appellant's contention fails on the merits.

A criminal defendant is constitutionally "entitled to a verdict in which all 12 jurors concur, beyond a reasonable doubt, as to each count charged." (*People v. Jones* (1990) 51 Cal.3d 294, 305.) Accordingly, when a defendant is charged with a single criminal act but the evidence reveals more than one such act, "either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act." (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) "This is the so-called 'either/or' rule,"

---

[3]In his opening brief, appellant appears to be arguing the trial court should have instructed the jury with CALCRIM 3500. However, in his reply brief, appellant clarifies that the "error in this case" was not "the failure of the trial court to give the CALCRIM 3500 unanimity instruction. Rather, . . . the trial court erred in not clearly and explicitly instructing the jury of the prosecution's election (along the lines prescribed in CALCRIM 3502) regarding the receiving-stolen-property . . . charge, after the prosecution failed to do so itself." CALCRIM 3502 provides: "You must not find the defendant guilty of [the alleged offense] . . . unless you all agree that the People have proved specifically that the defendant committed that offense [on]____ [insert date or other description of event relied on]. . . ."

"under which the trial court may meet its sua sponte obligations with *either* an election *or* an instruction." (*People v. Salvato* (1991) 234 Cal.App.3d 872, 878, 880.) Thus, if the prosecutor elects the specific act relied upon to prove the charge, the court has no duty to instruct the jury that it must agree on the same criminal act. (*Id.* at p. 880.) To be effective, the prosecution's election must be clearly communicated to the jury. (See *People v. Hawkins* (2002) 98 Cal.App.4th 1428, 1455.) The prosecution can do so by "tying each specific count to specific criminal acts elicited from the victims' testimony"—typically in opening or closing argument. (*People v. Diaz* (1987) 195 Cal.App.3d 1375, 1382.)

Here, as noted, the prosecutor elected to proceed on count 2 as to Ramirez's property only. Defense counsel stated, without prompting, that the prosecutor's election obviated the need for unanimity or alternative charge instructions. Because the prosecutor made an election, the trial court did not have a sua sponte duty to instruct the jury that it could find appellant guilty of count 2 based only on property stolen from Ramirez. (See *People v. Salvato*, *supra*, 234 Cal.App.3d at p. 878.)

Moreover, the prosecutor clearly communicated his election to the jury by stating during closing that the burglary charge related to Randall's property, while the receipt of stolen property charge related to Ramirez's property. He began his closing argument by stating that the evidence showed "the defendant is guilty of burglary of [Randall's house], and also guilty of receiving stolen property, *the property from Ms. Ramirez that was located in the suburban.*" (Italics added.) He explained that the burglary charge related to Randall's property—"Here, that's Ms. Randall's property"—before proceeding to explain that in contrast, the receipt of stolen property charge related to Ramirez's property: "Now, you hear about Count 2, which is receiving stolen property. That's basically toward the property of Ms. Ramirez that was located in the car. That property, the defendant did not have her permission to have . . . ." Although the prosecutor mentioned that Ramirez's purse was "strewn about with [Randall's] property," he did not say at any time that count 2 could also be based on Randall's property. Rather, he made it clear he was referring to Randall's property in the Suburban only to show that

8

Ramirez's property, which was "taken . . . around the same time," "in the same neighborhood," was also likely stolen.

Appellant asserts the jury "likely convicted [him of count 2] based on the evidence of his being in possession of the stolen electric saw, despite the fact that he was not charged with that conduct." The prosecutor, however, did not state or suggest at any time that appellant's possession of the box containing the Skilsaw could form the basis for count 2; rather, all statements he made about the Skilsaw were used to argue that appellant committed the burglary. In fact, even in his opening statement, the prosecutor did not refer to the Skilsaw in connection with count 2: "Based on the evidence . . . [I]'m going to ask that you find the defendant guilty of count 1, burglary of a residence, and also receiving stolen property for the property located in that suburban." Moreover, although appellant had no duty to assist the prosecutor in making the fact of the election clear to the jury, we note that defense counsel also exclusively and repeatedly referred to Ramirez's property in connection with count 2. Thus, there is no statement in the record made by either party or the court that supports appellant's position that it is "likely" he was convicted of count 2 based on evidence of the Skilsaw.

Appellant relies primarily on *People v. Melhado* (1998) 60 Cal.App.4th 1529 (*Melhado*), but the case is distinguishable. There, the defendant was charged with making a terrorist threat at a car repair shop. (*Id*. at p. 1533.) The evidence showed he appeared at the shop three times in one day—at 9:00 a.m., 11:00 a.m., and 4:30 p.m.— twice making threats, and twice carrying what appeared to be a hand grenade. (*Ibid*.) The prosecutor informed the court, outside the jury's presence, that he intended to use the 11:00 a.m. event as the basis for the charge. (*Id*. at p. 1534.) During closing argument, however, he did not inform the jury that the charge was based on the 11:00 a.m. event, and instead discussed all three events, referring to both the 9:00 a.m. and the 11:00 a.m. events as threats. (*Id*. at pp. 1534–1535.) The Court of Appeal concluded the trial court erred in refusing a unanimity instruction because, even if it were to "parse the prosecution's closing argument in a manner which suggests that more emphasis was placed on the 11 a.m. event than on the others," "the argument did not satisfy the

9

requirement that the jury either be instructed on unanimity or informed that the prosecution had elected to seek conviction *only* for the 11 a.m. event, so that a finding of guilt could only be returned if each juror agreed that the crime was committed at that time." (*Id.* at p. 1536.)

Appellant argues that *Melhado, supra,* 60 Cal.App.4th 1529, requires the prosecution to not only make its election clear, but to also instruct the jury regarding its duties by stating it must not convict the defendant unless it unanimously finds he or she committed the elected act. We do not read *Melhado* that way, and cases decided since *Melhado* likewise have not required the prosecution to make its election clear *and* provide such an explicit instruction. (E.g., *People v. Hawkins*, *supra*, 98 Cal.App.4th at p. 1455 [trial court was not required to provide a unanimity instruction where the prosecutor repeatedly asserted the basis for the charge during closing]; *People v. Mayer* (2003) 108 Cal.App.4th 403, 418 [the prosecutor's statements were sufficient where she made clear what evidence she was relying on, gave the basis of the charges in opening, and referred to another basis in closing in reference to another count]; *People v. Jantz* (2006) 137 Cal.App.4th 1283, 1292 [no unanimity instruction was required where "the prosecutor clearly informed the jury" that he was using a specific threat as the basis of the charge].)

In *Melhado*, because the prosecutor's election was ambiguous, the jury was never made aware of its duty to find the defendant guilty only if it unanimously found he committed a criminal threat at 11 a.m. (*Melhado*, *supra*, 60 Cal.App.4th at p. 1536.) In that situation, a unanimity instruction was required to ensure the jury would not convict the defendant based on the incidents that occurred at 9 a.m. or 4:30 p.m. the same day. (*Ibid.*) In contrast, here, there was no such ambiguity in the prosecutor's statements, which explicitly informed the jury more than once that count 2 was based on Ramirez's property, in contrast to count 1, which related to Randall's property.[4] We are satisfied

---

[4]We also note the trial court properly instructed the jury that it must evaluate each charge separately, and that in order to convict appellant of either of the charges, it must

10

that the jury in this case was sufficiently informed of the prosecutor's election and understood its duty to convict appellant of count 2 based only on Ramirez's stolen property. Accordingly, the trial court did not have a sua sponte duty to provide the jury with a unanimity instruction.[5]

## 2. Juror Discharge

### a. Background

During voir dire, Juror No. 11 informed the court that he had requested an excusal for hardship. He stated, "I'm going through sobriety. I don't even have a year, so I feel I don't have the right to judge another man's fate." The court told Juror No. 11 that the attorneys would question him about his concerns. However, neither party did so, and Juror No. 11 was ultimately sworn.

After the jury was sworn, but before selection of alternates, a Jury Services clerk handed the court a note stating, "[Juror No. 11] is having trouble. I advised him to provide a note to the Court. He states he is working[] on sobriety, and cannot remember the Judge's name, et cetera. He did file a hardship, which was denied. He is still having issues. I advised him I would let the Court know. I think he's currently in the jury box." The trial court noted it had previously denied Juror No. 11's hardship request because "[w]orking on sobriety" did not constitute an undue hardship. Defense counsel agreed it was not necessarily a hardship, and the prosecutor stated, "I would just ask we question him if it serves as a hardship. The fact he may think he may relapse, it's a concern, but I'll submit on that."

---

unanimously find him guilty of that charge, beyond a reasonable doubt. (CALCRIM 220, 3550, 3515.)

[5]Respondent argues in the alternative that no unanimity instruction was required because of the "continuous conduct" exception, i.e., that the thefts of Randall's property and Ramirez's property were so closely connected to each other that they formed part of one and the same transaction. In light of our conclusion that there was no sua sponte duty to provide a unanimity instruction, we need not—and therefore will not—address the continuous conduct exception.

The trial court brought Juror No. 11 in for questioning and asked him what his concerns were. Juror No. 11 said, "Well, my memory right now is kind of shot. I'm having trouble remembering what is said in Court, and you know, I want to be—I look to my fellow jurors to be able to, you know, remember what's said . . . ." He added, "I'm supposed to get my memory back because of my sobriety." He had been "using" since he was 10 or 11 years old—alcohol, then methamphetamine. At the time of trial, he was at "Vallejo Detox" and had been sober for 10 months, 8 days, the longest period of time he had ever been sober. He was homeless, lived "[w]herever I can find somewhere downtown," and worked as a laborer "[w]henever a job comes around."

When pressed, Juror No. 11 said he could "[n]ot really" remember the discussion the court had with the jurors that morning. Defense counsel asked if taking notes would help him remember. He responded, "I can't spell too good, so that won't help." When asked why he responded in his jury questionnaire that he had moral or religious principles that would make it difficult or impossible to judge whether someone was guilty or not guilty or a crime, he said, "That's where I draw a blank right there, ma'am. I mean, how do I say it? Like they're saying here, I don't know if he's guilty or innocent because I ain't got the facts." The court reminded him that appellant is presumed innocent, and asked, "So because you don't have any facts and because he's presumed innocent," "what would your verdict have to be?" Juror No. 11 responded, "Innocent," and said he understood those principles.

The court stated that despite Juror No. 11's issues, it appeared he was not incapable of performing his duties as a juror. Noting that it was a short trial with only a few witnesses, the court stated he could also have his memory refreshed by having the court reporter do a read back. "Before making a final finding," the court brought Juror No. 11 back in to inform him that the court reporter was taking down everything said in court. The court asked, "if you can have the [c]ourt reporter read back what the witness said because you simply don't remember, will that help you?" Juror No. 11 responded, "Yes." When asked whether he could "carry this responsibility if you have the opportunity to have readback and have any of your questions answered," he

12

responded, "I don't think I can.  [¶] . . . [¶] . . .   Just, it's—it is stressing me a lot right now.  You know, the fact that I have to judge that gentleman, (indicating), there, and you know, it's not interfering with my sobriety.  You know, in and out of jail, you know, I know what that man is going through right there; so that's about it."  The court asked, "If you are required to remain on the jury, will you do your job as a juror?" and he responded, "Yes."  The court determined it had no legal ground to remove him from the jury.

The next morning, the court stated that upon further reflection, it had concerns about Juror No. 11's ability to serve as a juror.  The court pointed out that he had written on his hardship request, "I do not have one year off subbrety."  The court noted that in addition to stating in his juror questionnaire that he had "moral or religious principles which would make it difficult or impossible to judge whether someone is guilty of a crime or not," he had also stated he had "opinions or feelings which would make it difficult or impossible to judge whether someone is guilty or not guilty of a crime."  His questionnaire also had a number of spaces that were left blank.  The court remembered those responses but said it had failed to follow up because it assumed the parties would do so during voir dire.

The court stated it had become concerned about his ability to understand and read jury instructions, follow and understand opening statements and closing arguments, and participate in deliberations.  "The trial is supposed to be a search for justice, and each side is entitled to have 12 independent, fully-functioning minds participating in that process, and if someone is so compromised they cannot fulfill their duties, then there is good cause for their removal . . . I haven't made a final determination yet."  The court and defense counsel discussed the various cases and statutes relating to the discharge of jurors.  The court asked the prosecutor whether he had any comments, and he responded, "No; I'll submit."

Juror No. 11 returned for questioning.  When asked if he was able to read, he said, "Not really," "It's got to be small words and stuff like that; not really big words."  He said he would have trouble reading jury instructions and writing any "big words" with

13

"more than five letters." Juror No. 11 said it was significant that he had been sober for less than a year "[b]ecause I believe over a year, you know, I'm getting more and more better, so, you know, my sobriety is still early, so my memory is still, you know, real short." "Like, I really can't concentrate, you know, my mind wanders off. That's about all I can state." He said his mind would wander off when "like the Court will be talking," and that "in a way" it happened during voir dire, when he could not keep track of "even half" of the proceedings, despite trying to concentrate.

When asked if there was anything that could be done to help him concentrate, he responded, "Just working on my sobriety." When asked if he would be able to follow the testimony of witnesses, Juror No. 11 said, "Not always." When asked if he could pay attention when the court read instructions, he said, "I could try." When asked if he could concentrate while the court read legal terms, he said, "Not really." When asked whether he could participate in deliberation, he responded, "That's hard to say, Your Honor." When asked if he felt competent to serve as a juror, he said "Not really," and explained: "Just the fact that, I feel that I'm, you know, with my memory and stuff like that, that I don't feel I can give that gentleman a fair trial." He reiterated this was due to his poor memory and that he could not remember "even half" the proceedings "so far."

Both parties questioned Juror No. 11. Defense counsel's questioning established that Juror No. 11 could keep track of time and understood he could ask the court reporter for read back. The prosecutor asked Juror No. 11 if he could be a fair and impartial juror, to which he responded, "No," because "I don't feel fair about, you know, not being able to remember and stuff like that. That's the whole thing." The court then asked whether he recalled a variety of jury instructions discussed the prior day. He responded "Yes" to every question, with the exception of responding "No, I don't," when asked whether he remembered the court "expressing the principles that govern our justice system."

The court asked Juror No. 11 to step into the hallway. Based on Juror No. 11's response that he recalled a variety of jury instructions, the court told the attorneys it appeared he was able to do his duty and that "he has more memory than he understands." The prosecutor disagreed. He pointed out that Juror No. 11 was confused, and "[w]hen

14

asked leading questions, he's answered it one way, but when given an open-ended question, he gives his version . . . ."

The court had Juror No. 11 return and said it would ask him only open-ended questions. This time, in response to open-ended questions, Juror No. 11 indicated he could not remember what the court had said. He did not understand that appellant did not have a burden of proof and asserted appellant did not need to present evidence because "he has an attorney." He did not understand who had to prove the case and asserted that the jury, witnesses, and court were required to present evidence. He said he "kind of" remembered the court talking about the burden of proof and did not understand what it meant, then said the defendant had the burden of proving the case beyond a reasonable doubt. Despite his previous answers, he said he drew a "blank" about the presumption of innocence and did not know what "presumed" meant. He also said he did not remember the legal concepts the court had explained the previous day.

The court ultimately held: "[A]fter having him back in here and asking him open-ended questions where he's just not agreeing with me or counsel and having him explain his understanding of things, it's clear he is not capable of understanding these terms. [¶] I don't think he's trying to get off of jury service; I think he sincerely wants to do the right thing, but I think it's clear that he is accurate in assessing his own cognitive skills. He says he can't concentrate. He says that he can't remember, and although we could get a reader in to help him read, he says his reading skills are compromised, that he can't write. [¶] . . . [¶] . . . The Court will find that there has been demonstrated a demonstrable reality that this juror is not able to perform his duties as a juror. Specifically, he's been an alcoholic since he was ten years old. He's used methamphetamine since he was 18. He appears to be in his late 30's or early 40's today, and he says he's continuously abused substances during that time period. [¶] He recently became clean and sober, about eight or nine months ago; perhaps ten. He's trying to hang on to that one-year sobriety period, and he says he can't concentrate. His mind wanders off. He can't remember half of what was said yesterday. [¶] I think at this point . . . [¶] . . . if what we're trying to do here is have justice rendered in this courtroom,

15

that upon clarification of his state of mind, it's clear that he simply cannot do it, and so I am prepared to have him removed from the jury. I will find that good cause exists to do so . . . ."

### b. Discussion

Penal Code section 1089 provides, in pertinent part: "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his duty, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged and draw the name of an alternate, who shall then take a place in the jury box, and be subject to the same rules and regulations as though he had been selected as one of the original jurors." (See Code Civ. Proc., §§ 233, 234.) "We review for abuse of discretion the trial court's determination to discharge a juror and order an alternate to serve. If there is any substantial evidence supporting the trial court's ruling, we will uphold it. [Citation.] We also have stated, however, that a juror's inability to perform as a juror ' "must appear in the record as a demonstrable reality." ' " (*People v. Marshall* (1996) 13 Cal.4th 799, 843.)

Here, the trial court did not abuse its discretion in discharging Juror No. 11. The record shows there was a "demonstrable reality" that Juror No. 11 could not perform his duties as a juror. He asked to be excused more than once due to memory and cognition problems, and repeatedly stated he could not concentrate or focus on the evidence or fully understand the instructions. He said he could not judge appellant's guilt given his recent sobriety, stating, "with my memory and stuff like that, . . . I don't feel I can give that gentleman a fair trial." His mind would frequently "wander off," and despite trying to concentrate, he could not remember "even half" of the proceedings. Over the course of multiple hearings, the court and the parties questioned him thoroughly, and while there were some moments of clarity, his responses, as a whole, showed he was incapable of performing the duties required of a juror. (See, e.g., *People v. Williams* (2001) 25 Cal.4th 441, 448 [a juror who refuses to or cannot follow the court's instructions is "unable to perform his duty" within the meaning of Penal Code section 1089]; *People v. Williams*

16

(1996) 46 Cal.App.4th 1767, 1780–1781 [a juror was properly discharged for being unable to comprehend simple concepts or remember events during deliberations such as recent discussions or votes, and was not following the law]; *People v. Collins* (1976) 17 Cal.3d 687, 690–693 [trial court properly discharged a juror who said she was unable to follow the court's instructions and "felt more emotionally than intellectually involved" in the case and wanted to be excused].)

Appellant argues "there is nothing that changed in Juror No. 11's answers during his fourth supplemental voir dire that could have undermined the trial court's three prior findings that [his] memory was sufficient to do his task as a juror." As the prosecutor pointed out and the court realized, however, leading questions appeared to mask Juror No. 11's cognitive problems. The final voir dire session allowed the court to evaluate Juror No. 11's responses to open-ended questions and determine, "After having him back in here and asking him open-ended questions where he's just not agreeing with me or counsel and having him explain his understanding of things, it's clear he is not capable of understanding these terms."

Appellant also complains that the court improperly discharged Juror No. 11 because of his substance abuse history. The court, however, initially declined to discharge Juror No. 11 on that basis, stating it did not constitute good cause for dismissal because he could perform his duties despite his past substance abuse. It was only later, after Juror No. 11 explained that his substance abuse history contributed to or caused his memory and cognitive issues, and the questioning revealed this was true, that the court found the substance abuse issue relevant. Given the record and the court's detailed findings, there is no basis to believe Juror No. 11 was discharged simply because he was once a substance abuser. (See *People v. Lomax* (2010) 49 Cal.4th 530, 582 [no abuse of discretion where the trial court "conducted a lengthy inquiry and gave detailed reasons for discharging the juror in question"].)

## DISPOSITION

The judgment is affirmed.

                        _____

                        McGuiness, P.J.

We concur:

_____

Pollak, J.

_____

Siggins, J.