[No. A049392. First Dist., Div. Five. Sept. 26, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL ANGELO SALVATO, Defendant and Appellant.

**[Opinion certified for partial publication.†]**

---

†Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II-V.

## COUNSEL

David McNeil Morse, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Ronald E. Niver and Laurence K. Sullivan, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

LOW, P. J.—This case presents the question of whether the defendant in a criminal case is entitled, upon demand at the start of trial, to have the prosecution elect which of several distinct acts is relied upon for each individual charge. We hold that he or she is, generally, entitled to an election upon demand, and that the court's refusal to require one is not in all cases

cured by the giving of a jury instruction which requires unanimous agreement on the particular act supporting the conviction.

Michael Angelo Salvato was convicted in a jury trial of dissuading a witness by threat of violence (Pen. Code, § 136.1, subd. (c)(1)),[1] terrorist threats (§ 422), obtaining signatures by extortionate means (§ 522) and sending extortionate letters (§ 523). The victim of these offenses was Mary Anne Crawford, whose marriage to Salvato was dissolved during the time period of the offenses.

The prosecution evidence generally showed that Salvato made numerous threats against Crawford directly and through her attorneys in an effort to dissuade her from seeking her share of the community property. Salvato's primary defense was that, depressed and distraught, he had sought only to humiliate Crawford and to shame her into reconciling; he did not intend to extort property from her or put her in actual fear of violence.

Salvato and Crawford were married in 1977. In 1986, Salvato, a longshoreman, suffered a temporarily disabling back injury for which he underwent surgery. In January 1987, he had a heart attack, and became seriously depressed. By October he was able to return to work but, according to Crawford, remained depressed and uncomfortable with other people.

Crawford moved out in December 1987. She testified to a series of threatening contacts beginning on January 20, 1988. On that day Salvato said, in a telephone conversation, that if Crawford came after the community property he would "take [her] out." On January 25, Crawford, through her attorney, Michael Dufficy, filed a petition for dissolution, in which the question of community property was reserved for future determination; Crawford was undecided whether to seek a division of the property. On January 26, Crawford received a telephone call from a therapist Salvato had been consulting, Kevin Heaney. Heaney said that Salvato had expressed an intent to kill Crawford, and that Heaney believed the threat was serious. On the same day Salvato's sister told her that Salvato said he would kill her and that he had a gun. On February 1, a friend relayed another threat by Salvato to kill Crawford and himself.

On February 2, 1988, Crawford, through Dufficy, obtained a temporary restraining order against Salvato. On February 3, Salvato left a box of Crawford's clothing, with tomato juice poured over it, on her doorstep. On February 5, he drove by her apartment and left messages on her answering machine. On February 8, Dufficy relayed to Crawford another threat by

---

[1]All further statutory references are to the Penal Code unless otherwise specified.

Salvato to kill her if she tried to get any of the community property. On February 18 and 19, he left telephone messages on Crawford's machine saying there would be "bad trouble" if she did not give up her part of the property. On February 19, Crawford signed a waiver of her interest in the community property. She also told the District Attorney's office that she did not want to press charges for violations of the restraining order. She took both steps because she was frightened by his threats.

In March, Salvato told Dufficy he would kill Crawford if she did not sign a quitclaim deed to her interest in their house. Dufficy relayed that threat to Crawford. On March 25, Crawford, frightened, signed the quitclaim.

The stipulated dissolution decree was filed in September 1988. In November 1988, Crawford retained attorney Barbara Rohan with the goal of having the waiver of community property and the quitclaim deed set aside. Rohan filed a motion for that purpose on February 15, 1989. She testified that she thereafter received from Salvato a series of threats aimed at her and her client. In telephone conversations on February 28 and March 1, Salvato told Rohan her client was making "a fatal mistake" in reopening the property question, and Rohan should advise her to leave the Bay Area. He also said that the law had no power over him, that he would take his own life and vindicate all divorced men in his situation.

On March 3, after a court hearing, Salvato drove by as Rohan and Crawford were standing in the parking lot and mimed shooting a handgun at them. On March 9, Salvato sent Rohan receipts for guns (including an AK-47) and ammunition he had purchased, and informed her and Crawford that he had bought them for his "new found hobby" of target practice. In a letter dated March 10, he wrote that more was at stake than money, that Crawford was trying to destroy his life and he would defend himself, and that even if she won in court he would win in "the court of nature."

On March 17, he wrote Rohan that the bridges were burning and he would eventually arrive at "the final bridge." In a phone conversation on March 24 he said they were "running out of time" and that he would never agree to a division of the community property. On April 5, he sent her a newspaper article about a man who was killed for giving testimony. On April 20, he sent a postcard referring to the Ramon Salcido killings, and, on April 24, a packet of news clippings relating to those killings. In the postcard he quoted Salcido's remark that "the law made me do it."

Throughout this period Rohan periodically repeated to Crawford the threats Salvato had made and sent her copies of his letters. Salvato was arrested and his house searched on May 10, 1989.

Salvato was convicted of the following charges:

| Count | Offense | Time Period Alleged |
| --- | --- | --- |
| I | § 136.1, subd. (c)(1) | 1/20/88—3/25/88 |
| II | § 136.1, subd. (c)(1) | 2/23/89—5/5/89 |
| III | § 422 | 9/23/88—5/10/89 |
| V | § 522 | 1/20/88—2/19/88 |
| VI | § 522 | 1/20/88—3/25/88 |
| VII | § 523 | 2/23/89—5/5/89 |

The jury acquitted on count IV, which charged a violation of section 422 with Rohan as victim.

Salvato was sentenced to a three-year term for count II, a consecutive eight-month term for count III, and concurrent three-year terms for counts V, VI and VII. A three-year term on count I was stayed pursuant to section 654.

I

Prior to trial Salvato moved to require the prosecution to elect the specific acts it would rely on in counts I through IV. That motion was denied and no election was made. The jury was later instructed, as to each count, that "all jurors must agree that [Salvato] committed the same act or acts." (CALJIC No. 17.01 (5th ed. 1988).) Salvato contends that despite the unanimity instruction he was entitled to a prosecutorial election and was prejudiced by its refusal. We agree that the ruling was prejudicial error as to count III, but conclude that counts I and II, charging intimidation of a witness (§ 136.1), fall within the exception for "continuous course of conduct" crimes, which do not require election of an individual act.

A

The doctrine of election protects two procedural rights of the criminal defendant in cases where the evidence tends to show a larger number of offenses than have been charged: the right to a unanimous jury verdict and the right to be advised of the charges. (*People v. Gordon* (1985) 165 Cal.App.3d 839, 866 [212 Cal.Rptr. 174] [conc. opn. by Sims, J.]; *People v. Dunnahoo* (1984) 152 Cal.App.3d 561, 570-571 [199 Cal.Rptr. 796].) While a jury instruction may help to ensure the former, it does nothing to effectuate the latter. The "either/or" rule, under which the trial court may meet its sua sponte obligations with *either* an election *or* an instruction (see *People v. Jones* (1990) 51 Cal.3d 294, 307 [270 Cal.Rptr. 611, 792 P.2d 643]), has

never been held to obviate the right of the defendant to a prosecutorial election *upon request.*

In the leading case of *People* v. *Castro* (1901) 133 Cal. 11 [65 P. 13], the defendant was charged with only one count of rape, while the prosecutrix testified to four separate acts of intercourse over several months. Our high court held that an election was required: "[C]ertainly, the defendant was not called upon to defend himself against all of these respective acts of intercourse, extending through a period of several months. . . . Possibly, any one of the acts sworn to by the prosecutrix could have been selected by the state as the act charged in the pleading, but the entire four acts could not be so selected. The state, at the commencement of trial, should have been required to select the particular act upon which it relied to make good the allegation of the information. This was not done; and even conceding that the failure to make such election at that time did not constitute error because of the want of demand . . . , still, when the case went to the jury, the court, in some form, should have directed their minds to the particular act of intercourse which it was incumbent upon the state to establish . . . . This was not done." (*Id.*, at p. 13.)

*Castro* establishes the following principles: (1) When the evidence tends to show a larger number of distinct criminal acts than have been charged, the prosecution must, upon defense request, select the specific act upon which it will rely for each allegation; (2) if there is no request for an election, the court must instruct the jury so as to ensure unanimity. (See also *People* v. *Williams* (1901) 133 Cal. 165, 167-169 [65 P. 323].)[2] *Castro* has never been overruled, and the above-quoted passage was repeated and relied upon more recently in *People* v. *Diedrich* (1982) 31 Cal.3d 263, 281 [182 Cal.Rptr. 354, 643 P.2d 971]. (See also *People* v. *Gordon, supra,* 165 Cal.App.3d at pp. 871-872 [conc. opn. by Sims, J.] [assuming that defendant entitled to election upon request]; *People* v. *Jordan* (1971) 19 Cal.App.3d 362, 371 [97 Cal.Rptr. 570] [election demand may be made by demurrer].)

No later case holds that an election is not required if requested. The Attorney General cites the statement in *People* v. *Madden* (1981) 116 Cal.App.3d 212, 216, footnote 4, [171 Cal.Rptr. 897], that "[t]he *Castro* rule

[2]*Williams* repeats the election requirement in a somewhat different factual context. *Williams* was the first case to deal with what has since come to be termed the problem of "generic" evidence in the "resident child molester" situation. (See *People* v. *Jones, supra,* 51 Cal.3d at pp. 299-300.) In addition to some specific testimony, the victim in *Williams* made a "sweeping general assertion" of daily intercourse. (*People* v. *Williams, supra,* 133 Cal. at p. 168.) The Supreme Court disallowed trial "upon a charge so indefinite as to circumstance of time or place, or any particular . . . ." (*Ibid.*)

is inapplicable where . . . CALJIC No. 17.01 or a similar instruction [is] in fact given." In *Madden*, there was no request for an election or an instruction; the appellate court reversed the convictions because the trial court had not met its duty to instruct sua sponte on unanimity. (*Id.*, at p. 219.) Thus the statement quoted, even if interpreted to mean that an instruction could substitute for an election when the latter was requested, would be dictum. Moreover, none of the three earlier opinions cited by the *Madden* court support the idea that an election may be denied, when requested, in favor of an instruction. In *People* v. *Foster* (1931) 117 Cal.App. 439 [4 P.2d 173], and *People* v. *LaMantain* (1949) 89 Cal.App.2d 699 [201 P.2d 598], elections were made; in *People* v. *Crume* (1976) 61 Cal.App.3d 803 [132 Cal.Rptr. 577], none was requested.

Several other cases hold, like *Madden*, that a unanimity instruction is required sua sponte, and that it is sufficient to protect the defendant's rights where no election has been demanded. This is the so-called "either/or" rule. (See, e.g., *People* v. *Martinez* (1988) 197 Cal.App.3d 767, 772-775 [243 Cal.Rptr. 66]; *People* v. *Callan* (1985) 174 Cal.App.3d 1101, 1111-1112 [220 Cal.Rptr. 339]; *People* v. *Gordon, supra,* 165 Cal.App.3d at pp. 852-854; *People* v. *Dunnahoo, supra,* 152 Cal.App.3d at pp. 572-573.) These courts had no occasion to discuss the question of whether the defendant was entitled to an election on request.

Two opinions have reviewed the rationale of *Castro* and *Williams*, and suggest that contemporary procedures—preliminary hearings and pretrial discovery—have eroded or eliminated the earlier concerns for proper notice of the specific charges. (*People* v. *Jones, supra,* 51 Cal.3d at pp. 317-318; *People* v. *Gordon, supra,* 165 Cal.App.3d at pp. 867-871 [conc. opn. by Sims, J.].) Neither opinion, however, mandates departure from the *Castro* rule entitling the defendant to an election on demand when the evidence tends to show more distinct criminal acts than charged.

In *Gordon, supra,* Justice Sims argued that the preliminary hearing transcript provides the defendant with practical notice of the particular acts against which he must defend, negating *Williams*'s assumption that an election might be required to provide notice of the criminal acts alleged. (165 Cal.App.3d at pp. 868-870.) For several reasons, we believe more specific notice is desirable. First, there is a matter of fundamental fairness. An accused person is entitled to know, as far as is practically possible, just which of his or her acts the prosecution claims were criminal. Where the prosecutor is aware that the evidence he or she plans to present will include several distinct acts, any one of which might arguably constitute the crime charged, there is no reason he or she should be allowed to play "hide the ball" with the defense.

Second, preliminary hearing testimony is frequently less specific than testimony at trial in showing particular events. That was the case here. (See pt. I C, *post.*) Even less detail is likely to be available in cases prosecuted by indictment in which no preliminary examination is held, as provided for by provisions of Proposition 115, approved at the June 4, 1990, election. There is no guarantee that pretrial proceedings, whether in the form of a preliminary examination or before the grand jury, will provide adequate notice of the acts which will be shown at trial.

Third, allowing the prosecution to proceed without an election, where one is demanded and is possible, unfairly prejudices the defense, even when all the acts have been revealed in a preliminary examination. In the absence of an election, evidence of all the potentially criminal acts is admissible without meeting the requirements for introduction of uncharged bad acts. (Evid. Code, §§ 352, 1101.) The defense may neither seek their exclusion nor request an instruction on the limited purpose for which they may be considered.

Fourth, the defendant may have defenses which apply to some acts and not to others, or which carry varying force for the different acts. Even a strong defense to one act will be of little avail if the prosecution can at any time, and without any formal step, shift its focus to others. While it may be theoretically possible to present various defenses to the various possible criminal acts without formal separation of the charges, the likely result in practice is jury confusion.[3]

In *Jones, supra,* our high court held that prosecution of child molestation charges through "generic" testimony did not, in itself, result in a denial of the defendant's right to fair notice and the opportunity to present a defense. (51 Cal.3d at pp. 317-321.) The court concluded that defendants were given adequate notice through the preliminary hearing, discovery, and demurrers, and an adequate opportunity to defend through denial, impeachment of the victim and expert testimony.

Where the evidence of the crimes is truly generic an election is impossible—there are no distinct acts among which to choose. Thus *Jones,* concerned as it was only with the question of prosecution with generic evidence, does not speak directly to the question presented here, i.e., whether an election among distinct acts is required on defense demand. While suggesting

---

[3]The response to an order for prosecutorial election will often be a cross-motion to amend the information adding separate counts for the various potentially criminal acts. (*People* v. *Gordon, supra,* 165 Cal.App.3d at p. 873.) For this reason, we agree that an election should be required only upon demand; a contrary rule would result in decreased exercise of prosecutorial discretion by encouraging the maximum number of charges in each case.

that *Castro* and *Williams* may be in some respects outdated, the *Jones* court did not expressly or impliedly overrule them on the question of election where the evidence shows several distinct acts of the type alleged.

■ We therefore follow *Castro*, holding that where several distinct potentially criminal acts are shown, and only one charged, the defendant is entitled, at the commencement of trial (or as soon as practically possible), to a prosecutorial election upon demand. We do not hold that an election is required in every criminal case involving multiple acts, nor that refusal to require one would be prejudicial error in all cases. First, election is only required on demand. Second, an election cannot be required where none is possible, as where the evidence is completely generic, or where the various acts do not constitute distinct potential crimes but rather one continuous course of criminal conduct. Finally, refusal will only be prejudicial if an election would have made some significant difference in the trial, whether through the exclusion of evidence, allowing a focused defense, or in some other respect that materially implicates the right to be advised of the charges.

B

■ Neither an election nor a unanimity instruction is required when the crime falls within the "continuous conduct" exception. (*People* v. *Diedrich, supra,* 31 Cal.3d 263, 281.) "This exception arises in two contexts. The first is when the acts are so closely connected that they form part of one and the same transaction . . . . [Citation.] The second is when . . . the statute contemplates a continuous course of conduct of a series of acts over a period of time. [Citation.]" (*People* v. *Thompson* (1984) 160 Cal.App.3d 220, 224 [206 Cal.Rptr. 516].) We conclude that section 136.1 falls within the latter aspect of the exception, but section 422 does not.

Decisions on the continuous course of conduct exception have focused on the statutory language in an attempt to determine whether the Legislature intended to punish individual acts or entire wrongful courses of conduct. Noting that "certain verbs in the English language denote conduct which occurs instantaneously, while other verbs denote conduct which can occur either in an instant or over a period of time," the court in *People* v. *Gunn* (1987) 197 Cal.App.3d 408, 415 [242 Cal.Rptr. 834], held that the accessory statute, punishing one who " 'harbors, conceals or aids' " a known felon, fell within the exception. (*Id.,* at p. 415.) *People* v. *Thompson, supra,* 160 Cal.App.3d at page 225, held that spousal abuse was a continuous conduct crime because the gravamen of the offense lay in the *cumulative result* of the acts, each of which alone might not be criminal. Conversely, *People* v. *Neder* (1971) 16 Cal.App.3d 846, 852-853 [94 Cal.Rptr. 364], held, in a somewhat

different context, that in a forgery prosecution each forged document could constitute a separate offense, even if part of the same transaction, because the essence of forgery, unlike theft, lies in the *means* used rather than the *end* obtained.

■    Subdivision (a)(1) of section 136.1 subjects to misdemeanor liability one who "[k]nowingly and maliciously prevents or dissuades any witness or victim from attending or giving testimony at any trial, proceeding, or inquiry authorized by law." Subdivision (a)(2) extends liability to attempts at prevention or dissuasion. Subdivision (c)(1) makes the offense a felony "[w]here the act is accompanied by force or by an express or implied threat of force or violence . . . ."

The language of section 136.1 focuses on an unlawful goal or effect, the prevention of testimony, rather than on any particular action taken to produce that end. "Prevent" and "dissuade" denote conduct which can occur over a period of time as well as instantaneously. The gravamen of the offense is the cumulative outcome of any number of acts, any one of which alone might not be criminal. Thus it falls within the continuous conduct exception, and no election or unanimity instruction was required. Salvato argues that the reference to "the act" in subdivision (c)(1) of section 136.1 indicates an intent to punish individual acts alone. In this context, however, it appears "act" was used synonymously with "offense," referring to whatever conduct was employed to dissuade or prevent a witness's testimony.

■    Section 422 presents a different case. That section reads, in pertinent part: "Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement is to be taken as a threat . . . which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety . . . shall be punished . . . ."

The language of section 422 focuses on an individual act—a threat—although an effect (fear) is also required. The criminal action is denoted by a verb—"threaten"—which ordinarily refers to an act taken at a particular moment in time rather than as a continuous course. The outcome, instilling of fear in the victim, does not come within the statute unless it is produced by a specific means, the "unequivocal, unconditional, immediate, and specific" threat. Thus section 422 does not come within the continuous course of conduct exception.

An election should therefore have been required as to the particular threat relied on for proof of count III.

## C

Affecting as it does the defendant's constitutional right to fair notice of the charges, the court's erroneous refusal to order an election requires reversal of count III unless it can be deemed harmless beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]; see *People* v. *Gordon, supra,* 165 Cal.App.3d at p. 855 [violation of either/or rule requires *Chapman* prejudice analysis].)

We are unable to so find here. The defense was faced with evidence of numerous acts occurring in the period charged which could have been the basis for count III. These included telephone calls to Rohan on February 28, March 1 and March 24, 1989, the mimed shooting on March 3, the gun receipts sent March 9, letters to Rohan on March 10, March 17 and April 20, and newspaper articles sent on April 5 and April 24. The prosecutor argued to the jury that this entire course of conduct constituted a violation of section 422, that Salvato was violating the statute "[i]n all his letters, in all his action[s]" during this period.

The preliminary hearing did not provide Salvato with notice of all these individual acts. Rohan testified specifically regarding the mimed shooting, the gun receipts, the Salcido postcard and a newspaper clipping, and a packet of letters she had received from Salvato was introduced. She did not testify to any specific phone calls, although she said she had received threatening calls from Salvato. It is possible that the jury relied for its verdict on the telephone conversations, of which Salvato had *not* received notice in the preliminary examination.

In addition, Salvato had different defenses to these several distinct acts. He might legitimately have claimed that some were not "unequivocal, unconditional, immediate and specific" as required by the statute; as to others he might have tried to show he did not know or intend they be transmitted from Rohan to Crawford; as to some or all he might have claimed he lacked the specific intent they be taken seriously as threats. Defense counsel did try to raise these points, but the multiplicity of acts resulted in the kind of unfocused, diffuse and confusing presentation which could be prevented by requiring an election. Despite the giving of a unanimity instruction, we believe the defendant was prejudiced by the refusal to order an election.

II-V*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

VI

*Disposition*

Count I is reversed and retrial is barred under the multiple prosecution provision of section 654. Count III is reversed but may be retried. The cause is remanded for further proceedings on count III and for resentencing.

King, J., and Haning, J., concurred.

Appellant's petition for review by the Supreme Court was denied December 18, 1991.

---

*See footnote, *ante*, page 872.