Filed 3/8/21  P. v. Ramsey CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ANDREW RAMSEY,<br><br>        Defendant and Appellant. | A155533<br><br>(Solano County<br>Super. Ct. No. VCR228361) |

Defendant appeals his conviction after a jury trial for felony infliction of corporal injury on his wife, Jacklyn Abikhair (Pen. Code[1], § 273.5, subd. (a)), and misdemeanor child endangerment (§ 273a, subd. (a)).  He argues that the trial court prejudicially erred by excluding evidence purportedly showing that his wife's father and attorney offered to forgo prosecution if he consented to his daughter's move to Australia; the prosecution should have been required to elect the act serving as a basis for the misdemeanor charge at his request; and insufficient evidence supports his misdemeanor conviction.  We shall affirm.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

1

## I. FACTUAL AND PROCEDURAL BACKGROUND

An information charged defendant with a felony violation of section 273.5, subdivision (a), and, after reduction on the court's motion pursuant to section 17, a misdemeanor violation of section 273a, subdivision (a).

### A. Abikhair's Relationship with Defendant

In 2013, while living in Australia, Abikhair met defendant, a dog trainer, online. Within months, their communications became romantic. When Abikhair first visited defendant in California, he was verbally abusive, controlling, and demeaning. She met defendant's ex-girlfriend, Lisa Maze, during this time, and Abikhair thought that defendant was also demeaning and controlling towards Maze. In the evenings, defendant would routinely drink beer, ranging from ten bottles to a full case of Sierra Nevada Torpedo IPA, and become intoxicated. He consumed beer so he could sleep because he took uppers during the day. When defendant was drunk, his verbal abuse was worse. He would also throw things and punch the refrigerator and wall.

After her visit, Abikhair went back to Australia, but she returned because she loved defendant and he told her he was sober. Defendant's behavior improved after she returned, although he continued to try to control her. Defendant and Abikhair married, and he began drinking again. His abuse increased in severity, but he was physically violent only when drunk. After drinking, he would choke Abikhair and pull her hair; he threw things at her and bit her nose. Abikhair testified

2

that defendant was aggressive during sex and hurt her. He told her that if she did not satisfy him, he would sleep with escorts. She also testified that defendant prohibited her from going to sleep unless he was with her, he hid her passport, and he threatened her life if she cheated on him.

Abikhair testified to an incidence of violence in June 2015. After teaching a dog seminar and not eating all day, defendant got drunk at a pub. Abikhair testified that she was not drunk and does not drink. She poured out the beer defendant had at the hotel when they got back there, and she woke up to defendant yelling at her. He had purchased more beer, so she started emptying it in the sink. He grabbed the bottle she was pouring out, she grabbed a new one to empty, and he choked her up against the wall. Defendant's Malinois dog, Fucil, who had training similar to police and military dogs, became agitated and bit her.

In December 2015, another incident of violence occurred. After Abikhair drove defendant, who was drunk, to the grocery store, he drove off and left her to walk home. At home, Abikhair and defendant argued and went upstairs. Abikhair was in bed when defendant jumped on her and punched her in the face, causing her nose to bleed and splitting her lip. After her nose stopped bleeding, defendant allowed her to clean up. He went to get another drink, and she locked herself in the bedroom. Defendant banged on the door, and eventually removed the door handle with tools. Once inside the bedroom, defendant yelled insults at Abikhair, who then went downstairs and grabbed a

3

bottle of mace. As she headed to lock herself in the bathroom, defendant grabbed and twisted her previously-injured wrist, took the mace, grabbed her hair, pushed her face to the ground, and sprayed the mace next to her face.

Notwithstanding this volatility in their marriage, Abikhair gave birth to defendant's child on November 2, 2016. Defendant thought conventional parenting was wrong, and he opposed physically comforting the baby. If the baby was crying, he would "kind of jolt her and kind of click in her face in an attempt to interrupt it." He put the baby in a bassinet tied to the walls, swung her in a car seat tied to the ceiling, stripped her of her diaper when she cried and put her on a granite bench, and put things from the freezer on her chest or back when she continued to cry. Abikhair would not leave the baby with defendant after she woke from a nap once and found him building a fire without a fireplace next to the baby.

### B. November 27, 2016

On cross-examination, Abikhair testified that, on November 27, 2016 (November 27), defendant got mad after she shoved one of his dogs away from a heater because she did not want the dog's hair to burn. Defendant punched Abikhair in the shoulder and grabbed the baby from her. He said he wanted to take the baby to the woods in Humboldt. Later, he returned the baby, and Abikhair took her upstairs to the bedroom and locked the door. When defendant knocked, Abikhair opened the door. He pushed Abikhair, grabbed her hair, and again grabbed the baby. Abikhair grabbed onto defendant as he held the baby and

4

tried to go down the stairs, he pushed her away as she held on, and the baby's head grazed against the wall.

## C. November 28, 2016

On November 28, 2016 (November 28), Abikhair testified that defendant woke up and wanted to have sex. She told him she wanted to wait for six weeks after giving birth. Abikhair testified that defendant pressured her, she did not say "no" in the midst of having sex, but it was painful and she cried. On cross-examination, Abikhar admitted that, later that day, she asked defendant to pick up condoms and coconut oil. She said she did so to prevent a repeat of the previous night.

That night, defendant arrived home at 7:30 or 8:00 p.m. and consumed about ten bottles of Sierra Nevada Torpedo beer. Around 11:00 p.m., he got mad when Abikhair asked him to stop slamming doors, and the two fought. The baby was upstairs sleeping. Abikhair testified that defendant was intoxicated and had been drinking all night. "He was slurring his words. His cheeks were flushed. His pupils were dilated. He had some behavioral tells that he was drunk, like he would kind of rub his goatee and say certain things repeatedly." Abikhair said she had become "very sensitized" to his drunken behavioral tics.

Abikhair put her hands on defendant's chest to calm him, but he pushed her onto the couch three or four times, first with his hands and then with a nearby bassinet. He said that he wanted to take the baby to the woods in Humboldt, initially saying for three days and then saying forever. He appeared

serious and said he would buy baby formula. He put his dogs in his truck and grabbed his backpack.

When defendant moved towards the stairs to get the baby, Abikhair grabbed a bottle of mace, put it in her pocket, and went to the stairs. She tried to block him from going upstairs, grabbed his jacket, and he pushed her and hit her with his jacket sleeve. Defendant slipped his jacket off, then put her against the wall or door next to the stairs, choking her with one and then two hands. He used enough pressure that she could feel the blood pumping in her head, and she was dizzy. Abikhair tried unsuccessfully to knee him in the groin. Defendant kneed her hard in the groin several times, and, when he tried to go up the stairs, Abikhair grabbed onto his clothes. He pushed her down and they ended up on the cement floor. Defendant got on top of Abikhair and began choking her with both hands while straddling her with his knees on her wrists. She had trouble breathing. Defendant was angrier when he choked her this time, and it went on for longer. He finally let go of Abikhair's neck because she punched him in the face, leaving a small cut above his eyebrow.

Abikhair began screaming. Defendant took his jacket from the floor, and, while choking her with one hand, stuffed it into her mouth. Abikhair bit defendant's fingers. He then got out his phone and began recording. Abikhair pulled out the mace and stood at the bottom of the stairs, trying to block him from going up. Defendant took the mace from Abikhair by twisting her wrist. He threatened to mace her, using one hand to pull her hair and head back. He pulled her back by her hair, leaving

6

chunks of her hair on the ground. Next, defendant lifted her and threw her down the stairs. Her head struck the ground, and she believed she lost consciousness.

When Abikhair regained consciousness, defendant was coming down the stairs holding the baby in one arm. She tried to crawl to the front door to block him. When Abikhair saw defendant standing on a table so he could climb out of the window in an adjacent room, she opened the front door, intending to go around to block him. Defendant then left through the front door. As Abikhair tried to stop him, he pushed and hit her in the face with either a closed first or open palm. Defendant put the baby in her car seat and drove away. He did not take any care items or milk for the baby. Abikhair was concerned for the baby's safety "[b]ecause [defendant] was drunk mainly." The baby, who was exclusively breastfed, had been fed around 9:30 p.m. and ate every two to three hours.

Abikhair called 911. She also called Maze. Maze came over, and the police arrived around 11:30 p.m. Officer Jones, one of the responding officers, testified that he did not recall exactly how many Sierra Nevada beer bottles he saw in the kitchen, but there were more than six; he did not inspect to see if the bottles were empty. Officer Jones observed injuries consistent with assault on Abikhair—redness on her neck, swelling on her cheek, and marks on her arms. Abikhair asked him how she could get full custody of the baby, and he obtained an emergency protective order for her.

After interviewing Abikhair and documenting her injuries, police called an ambulance, and she went to the hospital. Maze picked her up, and they went to Maze's home. Abikhair and Maze texted defendant to persuade him to return, and he eventually came to Maze's house with the baby at about 4:41 a.m. He parked in the middle of the street facing oncoming traffic and came to the front door. He left the truck engine running, the lights on, and the driver's door open.

Officer Jones instructed Maze to get the baby from the truck, and she did. The baby was very hungry and had dried feces stuck to her bottom. The police did not perform field sobriety tests on defendant, and Officer Jones did not observe signs of intoxication. Police arrested defendant, and Abikhair later obtained criminal and civil restraining orders. Defendant continued to contact her, prompting Abikhair to make several police reports.

### D. Lisa Maze's Testimony

Maze dated defendant for a number of years. She testified that he was controlling, verbally abusive when drunk and sober, and physically violent when under the influence. Defendant had picked Maze up by the neck, restricting her air flow, shoved her, pushed her on stairs, and hit her with a door. Maze admitted that she stabbed defendant twice.

One night in 2010, Maze vacuumed their room, upsetting defendant. She then sat at the foot of the bed with her back to him, holding toast on a plate. He said something and punched or shoved her in the back. She turned, and defendant punched her

8

in the face, splitting her lip; she threw the plate and hit his head, causing a laceration. Someone called police, and defendant's artery had to be sutured closed.

Maze's relationship with defendant ended mutually because her health deteriorated, though the two continued to see each other socially and professionally.

On November 28, after Maze went to Abikhair's home, Abikhair told her that defendant had pushed her down the stairs and she tried to stop him from taking the baby; Abikhair was hysterical; she had bruises on her arms and face, and there were clumps of her hair on the floor. Maze saw multiple beer bottles in the trash and on the coffee table, and she testified that the couple did not keep an untidy home. Maze picked Abikhair up from the hospital later that night and tried to reach defendant, who eventually responded and asked if it was safe to come to her home. Maze lied and told him it was, although she intended to call the police. When defendant arrived, the police were waiting, hidden. Maze met defendant outside, told him Abikhair was in the bedroom, and went to get the baby from the truck.

Maze told the district attorney that she wanted Abikhair and the baby to go back to Australia, and she would do anything to get them out. She also said, "I love it," and "it's my box of chocolates" when she was subpoenaed to testify at the preliminary hearing set for Valentine's Day.

### E. DeAmber Navejar's Testimony

Navejar dated defendant exclusively from 2004 to 2006 and casually from 2006 to 2010. She testified that defendant had

9

anger issues, was controlling, and was verbally and physically abusive when he drank. One time in 2006 or 2007, defendant grabbed Navejar by the throat and lifted her. She did not recall why he was upset or if he was drunk. She had trouble breathing, became dizzy, and had blurry vision. On another occasion, she and defendant argued, he appeared drunk, and his dog, Fucil, bit her. Navejar became pregnant in 2009 while seeing defendant casually and while he was in a relationship with Maze. She said Maze stalked her. Navejar's relationship with defendant ended when a paternity test showed that he was not her baby's father.

### F. Defendant's Witnesses

Defendant presented testimony from two friends, Jennifer Lynn Martin-Wong and Maryanne Steurer. Martin-Wong met defendant in 2010 or 2011 and testified that he was calm, friendly, and nonviolent. Defendant's dog, Fucil, was highly trained and nonviolent. Martin-Wong described Maze as confrontational; she had seen Maze argue with defendant, but defendant was patient with Maze. Martin-Wong stayed temporarily at defendant's apartment in September 2013, and Maze regularly dropped by unannounced. Defendant drank several beers daily while Martin-Wong stayed with him, but he was never violent or abusive. Martin-Wong had a positive impression of defendant's relationship with Abikhair. After the baby was born, Maze once started crying and said she still loved defendant in Martin-Wong's presence.

Maryanne Steurer had known defendant for more than five years, and they had been roommates for a little over a year at the

10

time of trial. She had not seen defendant drink since November 2016, and she never saw him violent or angry. She also lived with Fucil before the dog died, and she never saw Fucil be violent. Steurer thought that Maze still had feelings for defendant and was jealous of Abikhair. Steurer did not have the impression that defendant was trying to control Abikhair or limit her friends.

At trial, defense counsel argued that Abikhair initiated any violent encounter and defendant acted in self-defense on November 28, and counsel suggested that Maze and Abikhair plotted against defendant. The jury found defendant guilty, and the court sentenced him to the middle term of three years in state prison for count 1 and one concurrent year in county jail, time served, for count 2. Defendant timely appealed.

## II.  DISCUSSION

### A. *The Evidentiary Exclusions Do Not Require Reversal*

#### 1. Additional Background

Defense counsel orally moved in limine to introduce an email from Abikhair's family law attorney, Stephen Montagna, to defendant's first attorney in the family and criminal matters, Claire White, "regarding a proposal where essentially what would happen is if [defendant] would consent to the daughter getting a passport and . . . basically consent[ ] to Ms. Abikhair going to Australia, that they wouldn't pursue criminal charges." Counsel argued that the email was relevant to show that Abikhair had a motive to exaggerate or lie about what happened on November 28, "her motive [being] that she wants custody of [the baby] so

11

she can go to Australia." The trial court tentatively found the email inadmissible as hearsay and settlement discussions but instructed counsel to research the matter before its final ruling. After opening statements, the trial court ruled the interaction between White and Montagna was inadmissible under the hearsay rule and Evidence Code section [1153.5].[2] The court told defense counsel, "[D]on't go into that on cross-examin[ation]." Defense counsel responded that, even if she could not ask White about the email, she should be able to ask Abikhair on cross-examination if it was Abikhair's intent to drop the charges and to impeach Abikhair if she lied. The trial court postponed a final ruling.

In a recess during Abikhair's direct examination, defense counsel raised the issue again, confirming that she wanted to cross-examine Abikhair about a deal to "[w]ork out something where there is no criminal prosecution or DV restraining order" and adding that she also sought to cross-examine Abikhair about communications between Abikhair's father and defendant "along the same matter." The prosecutor responded that the evidence was hearsay, and she said she had spoken with Montagna who said that it was defendant's attorney, White, who approached him with this compromise and the deal was discussed with

---

[2] The trial transcript refers to Evidence Code sections 11353.5 and 1153.5. The former statute does not exist, so we presume the correct reference is to Evidence Code section 1153.5, which provides, "Evidence of an offer for civil resolution of a criminal matter pursuant to the provisions of Section 33 of the Code of Civil Procedure, or admissions made in the course of or negotiations for the offer shall not be admissible in any action."

12

Abikhair's family. Defense counsel responded that White would state that Abikhair was present by speaker phone on one call where the deal was discussed.

The trial court ruled the communications inadmissible negotiations to settle the criminal matter. It further ruled under Evidence Code section 352 that the probative value of such evidence was low because, even inferring that Abikhair was willing to settle in exchange for custody, this fact had little probative value in inferring Abikhair made up and lied about the incident at issue, and the consumption of time in explaining how settlement negotiations between lawyers work and potential jury confusion warranted exclusion. The trial court ruled there would be no questions on the issue, including by use of the preliminary hearing testimony as impeachment. Defendant objected under the Sixth Amendment.

Before the conclusion of Abikhair's direct examination, defendant renewed the request to cross-examine Abikhair about whether her father had offered to drop criminal charges if defendant dropped his custody claim. The prosecutor responded that such an inquiry would reference hearsay between Abikhair's father, who was in Australia, and prior defense counsel. Defense counsel argued that there was evidence that Abikhair was aware of these discussions, thus there was a basis to confront her about them. The trial court denied the request on hearsay and Evidence Code section 1153.5 grounds, and defendant objected under the Sixth and Fourteenth Amendments.

13

Tracey Abikhair, Abikhair's mother, later testified on cross-examination that she told the district attorney her husband had come to California in December 2016 to negotiate with defendant. Counsel asked, "From your understanding Mr. Abikhair had communicated that if he let [the baby] and [Abikhair] go home to Australia, that they would drop the charges; is that correct?" Abikhair's mother said, "No, I don't think so." The prosecution objected based on the court's prior ruling, and the court sustained the objection and struck the testimony. Defense counsel then tried to show Abikhair's mother an email, and the prosecutor objected on the same grounds. The court sustained the objection, and the court conducted a sidebar when defense counsel sought to use the email as impeachment. The court ruled that the email was not impeachment, and that its prior ruling under Evidence Code section 352 governed.

### 2. Analysis

Defendant argues that the trial court's exclusion of evidence violated his Fourteenth Amendment right to present a defense and his Sixth Amendment right to confrontation. The Attorney General contends that the exclusion was proper, and defendant's constitutional rights were not violated. As set forth below, we find no constitutional violations or prejudicial state law error.

To proceed with our analysis, we must first decipher the scope of defendant's challenge. As framed in his briefing, defendant's main argument is that the exclusionary rulings violated his federal constitutional rights. Within this argument,

he also contends the evidence was not hearsay and was improperly excluded under Evidence Code section 1153.5. He does not, however, challenge the court's cross-examination and impeachment rulings under Evidence Code section 352. With the exception of the single email between attorneys that defendant sought to introduce through White, the trial court excluded the cross-examination and impeachment evidence at issue under Evidence Code section 352. Because defendant forfeited any challenge to this ruling by failing to raise it (*People v. Zamudio* (2008) 43 Cal.4th 327, 353–354), we accept that the court properly prohibited cross-examination and impeachment of Abikhair and her mother under Evidence Code section 352. Defendant's challenge is thus that his federal constitutional rights were violated by the trial court's proper rulings under Evidence Code section 352, and by one allegedly erroneous ruling excluding the email.

In general, the application of the ordinary rules of evidence does not impermissibly infringe on a defendant's constitutional right to present a defense. (*People v. Fudge* (1994) 7 Cal.4th 1075, 1102–1103.) Although completely excluding evidence of an accused's defense could theoretically rise to this level, excluding defense evidence on a minor or subsidiary point does not implicate due process concerns. (*Id.* at p. 1103.) Indeed, neither the right to a fair trial nor the right to present a defense confers on defendant " 'a constitutional right to present all relevant evidence in his favor, no matter how limited in probative value

15

such evidence will be so as to preclude the trial court from using [section 352].' " (*People v. Babbitt* (1988) 45 Cal.3d 660, 684.)

Here, with respect to the excluded evidence's probative value to show Abikhair lied, the trial court fairly observed that, even assuming that Abikhair was willing to settle in exchange for custody, this did not have significant probative value to support the inference that she made up the incident at issue. Indeed, the probative value of this evidence was further called into question by the prosecutor's representation that it was defendant's attorney, not Abikhair or her attorney, who proposed the compromise that the Abikhair family later discussed.

The trial court's exclusion of this evidence also did not deprive defendant of the opportunity to present a defense. His main defense was not that Abikhair fabricated the entire incident. Instead, his counsel argued self-defense, and he succeeded in getting Abikhair to concede that every act defendant took on the November 28 was a direct reaction to her attempts to prevent him from leaving. His counsel also put on the defense that the prosecution did not prove that he was drunk and none of his actions created conditions likely to cause the baby great bodily injury or death.

Moreover, the defense theory of Abikhair's motive to lie was supported by other evidence. On cross-examination, Abikhair admitted many things, including the following: She wanted to leave the country with the baby but could not because defendant would not consent; she first publicly accused defendant of strange parenting behaviors when she sought court permission to leave

16

the country, and she did not tell anyone about these behaviors before November 29, 2016 or document them in her early request for a restraining order; it was her idea to tell the prosecution about defendant's violent incidents with Navegar and Maze; and she was aware of a conversation where her family and attorney told defendant that if he let her and the baby leave, he could come to Australia later and work on their relationship. Defense counsel also successfully impeached Abikhair when she denied having admitted that defendant's conviction would make it easier for her to gain custody and leave the country, and Abikhair thereafter admitted that his conviction would do just that. In closing argument, defense counsel used these concessions to insinuate that Abikhair made up the strange parenting behaviors after hiring a family law attorney, highlighted that Abikhair did everything she could to help the prosecution, and argued that Abikhair did a good job of setting up the case so she could leave with the baby to Australia. On this record, the court's evidentiary rulings did not violate defendant's Fourteenth Amendment right to put on a defense.

Defendant's Sixth Amendment argument fares no better. It is well established that a trial court may restrict cross-examination of a witness based on Evidence Code section 352 without raising constitutional concerns. (*People v. Quartermain* (1997) 16 Cal.4th 600, 623.) "A trial court's limitation on cross-examination pertaining to the credibility of a witness does not violate the confrontation clause unless a reasonable jury might have received a significantly different impression of the witness's

credibility had the excluded cross-examination been permitted." (*Id.* at pp. 623–624.) The trial court appropriately found that the evidence at issue did not have significant probative value to prove Abikhair fabricated her testimony. Defense counsel was able to cross-examine Abikhair on her motive, establish that defendant stood in the way of Abikhair's wish to depart with the baby, and successfully impeach Abikhair when she denied admitting that defendant's conviction would make it easier for her to leave. In light of this testimony, defendant has failed to show the excluded evidence would have produced a "significantly different impression" of Abikhair's credibility, as required to establish a constitutional violation. (*Ibid.*)

Finally, with respect to the email between White and Montagna, defendant does not clearly argue that state evidentiary error provides an independent ground for reversal. Nonetheless, even assuming the trial court improperly excluded the email, the error would not be prejudicial. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) Defendant concedes that independent evidence, including testimony from Maze, Navejar, and Officer Jones, corroborated Abikhair's description of defendant's assault. This corroboration supported Abikhair's overall credibility. And, for the same reasons there was no constitutional violation—the probative value of the email was not substantial and defendant put on other evidence of Abikhair's motive to lie—it is not reasonably probable that defendant would have obtained a more favorable result had the court not excluded the email.

## B. *Failure to Require a Prosecutorial Election Does Not Require Reversal*

### 1. Additional Background

The complaint alleged felony violations of section 273.5, subdivision (a) and section 273a, subdivision (a). At the preliminary hearing, Abikhair described the altercations between her and defendant on November 27 and November 28. The prosecution sought a holding order for a second violation of section 273a, subdivision (a), for the November 27 incident. The magistrate denied the request, finding that any injury caused to the baby on November 27 was Abikhair's fault. With respect to count 2 for the November 28 incident, the magistrate reduced the count to a misdemeanor pursuant to section 17 and commented that he could not find a "likelihood of death or great bodily injury." The magistrate issued a holding order for a felony violation of section 273.5, subdivision (a) and for a misdemeanor violation of section 273a, subdivision (a), and the prosecution filed a corresponding information.

Defendant filed a motion pursuant to section 995, requesting dismissal of count 2 for lack of likelihood of great bodily harm or death. The court denied the motion, finding the magistrate's comments on great bodily injury or death stated a legal conclusion, and Abikhair's testimony that defendant drank about ten beers before taking the baby in the car provided

19

sufficient evidence for this charge.[3]  During trial, the court denied a similar section 1118.1 motion.

After the close of evidence, defense counsel for the first time requested a prosecutorial election for the child endangerment count.  The prosecutor responded that she would be arguing multiple acts, with one being driving under the influence.  The court told defense counsel to research whether an election was required, and when the issue was raised again, the court ruled the prosecution did not have to elect a theory.  Later in the hearing, when discussing jury instructions, the court indicated that it would give a unanimity instruction but did not refer to a specific count to which the instruction would apply. Citing *People v. Napoles* (2002) 104 Cal.App.4th 108, a case involving a continuous course of conduct crime, the prosecution countered that a unanimity instruction was unnecessary, but if the court was inclined to give one, it should give CALCRIM No. 3501.  The court ruled that CALCRIM No. 3501 did not apply.

Before closing arguments, the court instructed the jury on count 1 with CALCRIM No. 3500, the standard unanimity instruction.  When discussing count 2 in her closing argument, the prosecutor mentioned defendant's leaving without food, his

---

[3] Defendant does not argue on appeal that the magistrate's comment regarding great bodily injury or death constituted a factual finding that precluded the prosecutor from filing an information charging misdemeanor child endangerment under conditions or circumstances likely to cause great bodily harm or death in violation of section 273a, subdivision (a), and the magistrate in fact issued a holding order for this count.

driving with the baby while drunk, and his holding the baby while punching Abikhair.  Thereafter, noting that the drunk driving and the punch were discrete incidents, the court said that it would give CALCRIM No. 3500 for count 2.  In her rebuttal closing, the prosecutor argued, "in addition to driving under the influence [defendant] committed other acts that were likely to cause great bodily injury or harm to this three-week-old baby.  He left the house without bringing any food for her.  He was carrying the child while he was punching Jackie Abikhair."  Thereafter, the court instructed the jury with CALCRIM No. 3500 for both counts.[4]

## 2. Analysis

Defendant argues that the court erred by failing to require an election and instructing the jury with CALCRIM No. 3500 rather than CALCRIM No. 3502 (the unanimity instruction to be

---

[4] The instruction stated, "The defendant is charged with: Inflicting Injury on a Spouse Resulting in a Traumatic Condition in Count One and the lesser crime of Simple Battery Against a Spouse; Child Endangerment Likely to Produce Great Bodily Harm or Death in Count Two and the lesser crime of Child Endangerment. [¶] The People have presented evidence of more than one act to prove that the defendant committed these offenses.  You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act he committed."

given when an election occurs)[5] for count 2. Defendant contends this caused prejudice because (1) it allowed a conviction based on acts occurring before November 28, specifically the November 27 incident barred by the magistrate's factual findings; and (2) it allowed a conviction based on two November 28 acts as to which defendant purportedly had insufficient notice. As set forth below, we disagree.

Preliminarily, we address the Attorney General's contention that defendant forfeited his challenge by failing to object when the trial court said it would instruct with CALCRIM No. 3500 for count 2 after twice previously denying defendant's request for election. As defendant briefs his argument, the thrust of his challenge is to the failure to require an election when demanded, a challenge he did not forfeit, and we do not view his arguments with respect to CALCRIM No. 3500 independently from this alleged error. We therefore turn to the merits of his failure to elect claim.

To support his argument that an election was required, defendant relies on *People v. Salvato* (1991) 234 Cal.App.3d 872, 875–876 (*Salvato*), which held that a defendant is entitled, upon demand at the start of trial, to a prosecutorial election when

---

[5] CALCRIM No. 3502 states, "You must not find the defendant guilty of <insert name of alleged offense> [in Count ] unless you all agree that the People have proved specifically that the defendant committed that offense [on] <insert date or other description of event relied on>. [Evidence that the defendant may have committed the alleged offense (on another day/ [or] in another manner) is not sufficient for you to find (him/her) guilty of the offense charged.]"

22

several distinct acts could serve as the basis for a single charge. In *Salvato*, ten criminal threats could have served as the basis for one charge. (*Id.* at p. 884.) Despite the fact that the trial court gave a unanimity instruction, the appellate court held that the defendant was entitled to an election on demand at beginning of trial, explaining that "[t]he doctrine of election protects two procedural rights . . . the right to a unanimous jury verdict and the right to be advised of the charges. [Citations.] While a jury instruction may help to ensure the former, it does nothing to effectuate the latter." (*Id.* at p. 878.) *Salvato* rested on concerns regarding fair notice and a defendant's ability to meet the prosecution's evidence and present a defense. (*Id.* at pp. 880–881.) *Salvato* thus recognized that refusal to require an election "will only be prejudicial if an election would have made some significant difference in the trial, whether through the exclusion of evidence, allowing a focused defense, or in some other respect that materially implicates the right to be advised of the charges." (*Id.* at p. 882.) Under *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*), the court found the refusal prejudicial because the victim did not, at the preliminary hearing, testify to all of the threats she later testified to during the trial, which resulted in the presentation of separate defenses to each threat that were "unfocused, diffuse and confusing" to the jury. (*Id.* at p. 884.)

Assuming *Salvato*'s holding is valid,[6] it does not control here. *Salvato*'s justification for requiring an election *at the start of trial* centered on concerns affecting notice and the conduct of the trial, such as a defendant's right to be informed of the evidence to be introduced by the prosecution, to seek exclusion of evidence, and to prepare and put on a focused defense. (*Salvato*, *supra*, 234 Cal.App.3d at pp. 880–881.) Those concerns dissipate where, as here, the defendant does not demand an election until after the close of evidence. Defendant does not discuss the rationale supporting *Salvato*'s holding in any depth, he does not cite to authority requiring an election after the close of evidence, and he does not make a reasoned argument for why such election should be required at that point—a point well *after* the defense had obtained notice of the prosecution's evidence through the preliminary hearing and trial testimony, had the opportunity to seek exclusion of evidence by motions and objections, and had

---

[6] *Hoffman v. Superior Court* (2017) 16 Cal.App.5th 1086, 1095, 1098, declined to apply *Salvato* to require an election at the demurrer stage. The court found *Salvato* flawed in several respects, including: (1) *Salvato* relied on *People v. Castro* (1901) 133 Cal. 11 (*Castro*), an old Supreme Court case holding that an election is required at the start of trial if demanded in a case where four acts of intercourse could have served as the basis for one statutory rape count, but *Salvato* failed to recognize that *Castro* was decided before section 954 was rewritten and when only one offense could be charged; (2) a defendant is fully apprised of the acts he or she must defend against by the evidence disclosed at the preliminary hearing in modern criminal practice; and (3) *Salvato*'s ruling "runs contrary to an expansive body of case law" requiring either election or a unanimity instruction. (*Id.* at pp. 1095–1098.)

presented its entire defense. Defendant thus fails to demonstrate error in the trial court's ruling.[7]

Moreover, even if there were error, it was harmless beyond a reasonable doubt. (*Chapman*, *supra*, 386 U.S. at p. 24.) Defendant claims refusal to require an election was prejudicial because he may have been convicted for acts occurring before November 28, namely the November 27 incident. But from the beginning, the prosecutor focused on November 28. The court read count 2, alleging child endangerment on or about November 28, to all potential jurors. The prosecutor did not ask Abikhair about November 27 in her direct examination; instead, as defendant told the jury in closing argument, defendant brought the incident up on cross-examination, and defendant argued that Abikhair attacked him on November 27. The prosecutor mentioned November 27 in her closing argument and touched on defendant's odd parenting behaviors briefly in rebuttal, but only to argue that these incidents explained Abikhair's concern over defendant's parenting and showed that Abikhair, not defendant, acted in defense of the baby on November 28. When specifically addressing count 2, the prosecutor referenced only acts on November 28. She stated, "The only reasonable conclusion that

_____

[7] The Attorney General argues that an election was not required because this is a continuous course of conduct case. (*Salvato*, *supra*, 234 Cal.App.3d at p. 882 ["Neither an election nor a unanimity instruction is required when the crime falls within the 'continuous conduct' exception"].) However, as defendant notes, that was not the way the case was argued to the jury. Because we find no error in the failure to require an election in any event, we do not further address this argument.

25

you can reach when you consider all of this evidence in total is that [defendant] is abusive, *that on November 28, 2016* he caused traumatic injury to his wife Jaclyn Abikhair and he placed his child in danger in circumstances likely to produce great bodily injury or death." Thus, the prosecutor clearly told the jury that the child endangerment happened on November 28. On this record, we are satisfied beyond a reasonable doubt that any alleged error did not prejudice defendant in the manner he claims.

We also reject defendant's claim that he was prejudiced because he could have been convicted for acts on November 28 of which he had insufficient notice—namely depriving the baby of milk or hitting Abikhair while holding the baby. Unlike the threats in *Salvato*, Abikhair testified at the preliminary hearing regarding both of these acts, stating that defendant left that night without milk or supplies, and, as she tried to stop him from leaving with the baby, he "flew out an arm" and hit her. Her trial testimony contained no material variance. Because defendant did not request an election until after the evidence closed, an election would not have made a difference in the presentation of evidence or in cross-examination. And unlike the ten threats and confusing presentation in *Salvato*, the prosecution argued only three acts, and defense counsel clearly told the jury that the prosecution did not establish beyond a reasonable doubt that he drove drunk, and no other evidence established circumstances likely to produce great bodily harm or death. Defendant makes no attempt to identify any way in which the denial of his request

26

for election impacted his defense regarding these acts. Accordingly, the trial court's refusal to require an election at the close of evidence does not justify reversal.

## C. Sufficient Evidence Supports Count Two

Finally, we examine whether sufficient evidence supports defendant's conviction on count 2. He argues that we must reverse his conviction because the evidence was factually inadequate to show circumstances "likely to produce great bodily harm or death."

"Our role in considering an insufficiency of the evidence claim is quite limited. We . . . review the record in the light most favorable to the judgment [citation], drawing all inferences from the evidence which supports the jury's verdict." (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1382.) Substantial evidence is evidence that is "reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.) We presume the existence of every fact the trier of fact could have reasonably deduced from the evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) We do not decide credibility issues or evidentiary conflicts. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) Before a verdict may be set aside for insufficiency of the evidence, a party must demonstrate " 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

27

Section 273a, subdivision (a) provides in relevant part, "[a]ny person who, under circumstances or conditions likely to produce great bodily harm or death, . . . having the care or custody of any child . . . willfully causes or permits that child to be placed in a situation where his or her person or health is endangered, shall be punished." "Two threshold considerations . . . govern all types of conduct prohibited by this law: first, the conduct must be willful; second, it must be committed 'under circumstances or conditions likely to produce great bodily harm or death.' " (*People v. Smith* (1984) 35 Cal.3d 798, 806.) There is no requirement that the child actually suffer great bodily injury. (*People v. Cortes* (1999) 71 Cal.App.4th 62, 80.)

The prosecution argued that count 2 was based on three possible acts—driving drunk with the baby, hitting Abikhair while holding the baby, and leaving with the baby without milk and depriving her of food for about seven hours On appeal, the Attorney General contends these acts constituted a continuous course of conduct. However, the prosecutor told the jury that the separate acts were sufficient to prove circumstances likely to produce great bodily harm or injury, defense counsel told the jury it had to unanimously agree as to the act, and the trial court gave a unanimity instruction. We thus review each argued act.

Viewed in the light most favorable to the judgment, sufficient evidence established that defendant drove while intoxicated, creating circumstances "likely to produce great bodily harm or death." (§ 273a, subd. (a).) Abikhair testified that

28

defendant had about ten beers in three hours before driving on the night of November 28; at trial she estimated "at least" ten, she disagreed when defense counsel suggested she did not know how much beer he drank, and she agreed she felt better about saying ten.  In her 911 call that night, she said defendant had not eaten all day.  Abikhair testified to her familiarity with defendant's drinking, and said he was physically violent only when intoxicated.  She described their violent altercation on November 28, and said she knew defendant was intoxicated because she saw him drinking that night "since he got home to when he left," he was slurring his words, his cheeks were flushed, and his pupils were dilated.  She also knew he was drunk because he had some behavioral tells when drunk, like rubbing his goatee and saying certain things repeatedly, and she had become very sensitive to these tells.  Officer Jones and Maze offered some corroborating testimony:  Jones saw more than six beer bottles in the kitchen (although he did not check whether they were empty) and said Abikhair appeared sober.  Maze saw multiple beer bottles in the trash and on the coffee table.  In addition to the evidence of drinking, the baby was only three weeks old, supporting a reasonable finding by the jury that defendant drove with her in circumstances presenting a high probability of great bodily harm or death.

The second act involved defendant hitting Abikhair while he held the baby.  He claims the evidence is insufficient here because he is an adult male who must be presumed to have the physical capability to hold an infant and use the other arm for

29

another act.  Defendant ignores the evidence of his inebriation and the nature of the other act.  While intoxicated, defendant held a vulnerable three-week old in one hand while using the other to assault his wife with enough force to produce visible swelling on her cheek.  The three-week old could have been seriously injured had defendant lost his balance or grip while drunkenly hitting Abikhair.  This evidence, too, is sufficient to establish circumstances likely to produce great bodily harm or death.

On the other hand, defendant's challenge to the insufficiency of the evidence regarding the first act—leaving without milk and depriving the baby of milk for about seven hours—appears well-taken.  There was no evidence from which the jury could conclude beyond a reasonable doubt that defendant did not feed the baby with formula when he was gone, and there was no medical evidence regarding the effect of depriving the three-week old baby of milk for this period of time.  While the jury could reasonably infer that the baby might have been quite hungry, without such evidence, the prosecution did not prove circumstances or conditions likely to produce great bodily harm or death based on this act.

Reversal, however, is not required.  First, defendant does not argue that reversal is necessary if sufficient evidence supports the child endangerment count based on two of the three acts argued by the prosecution, and he has accordingly forfeited any such claim.  (*People v. Zamudio*, *supra*, 43 Cal.4th at pp. 353–354 [issues not raised in the opening brief on appeal are

30

forfeited].)  In addition, defendant's argument with respect to the act of depriving the baby of milk is an argument based on a failure of proof; such a failure of proof is detectable by a jury, and the record does not establish that the jury returned a conviction on the factually insufficient theory.  (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129 [where the jury is presented with legally correct instructions on one or more theories for which there was inadequate factual proof, reversal is not required if "a valid ground for the verdict remains, absent an affirmative indication in the record that the verdict actually did rest on the inadequate ground"].)[8]  There was one jury request to see the cell phone video from defendant's phone recording Abikhair with the mace before defendant took the baby, and another to review her testimony about being pushed with the bassinet; and the jury deliberated

---

[8] With respect to count 2, the court used CALCRIM No. 821 to instruct the jury that the prosecution was required to prove: "1. The defendant, while having care or custody of a child, willfully caused or permitted the child to be placed in a situation where the child's person or health was endangered; [¶] 2. The defendant caused or permitted the child to be endangered under circumstances or conditions likely to produce great bodily harm or death; [¶] AND [¶] 3. The defendant was criminally negligent when he caused or permitted the child to be endangered. [¶] Someone commits an act willfully when he or she does it willingly or on purpose. [¶] The phrase likely to produce great bodily harm means the probability of great bodily harm is high. [¶] Great bodily harm means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm."  The jury was also instructed on the lesser-included offense of violation of section 273a, subdivision (b).  Defendant does not contend that this instruction was erroneous.

for less than two hours.  We therefore reject defendant's claim that there was insufficient evidence on count 2.

## III.    DISPOSITION

The judgment is affirmed.

BROWN, J.

WE CONCUR:

POLLAK, P. J.
TUCHER, J.

*People v. Ramsey*  (A155533)