Filed 11/25/25  P. v. Kuks CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE, | C102501 |
| Plaintiff and Respondent, | (Super. Ct. No. 22F1125) |
| v. | |
| TRAVIS PATRICK KUKS, | |
| Defendant and Appellant. | |

A jury found defendant Travis Patrick Kuks guilty of willful infliction of corporal injury resulting in a traumatic condition on a person, E.M., with whom he had or previously had a dating relationship (count 1—Pen. Code, § 273.5, subd. (a)[1]); false imprisonment by violence or menace (count 4—§§ 236, 237); dissuading E.M. from reporting a crime by force or threat (count 5/6—§ 136.1, subds. (b)(1), (c)(1));

_____

[1]  Undesignated statutory references are to the Penal Code.

1

interference with a wireless communication device (count 7—§ 591.5); vandalism of C.L.'s truck (count 8—§ 594, subd. (b)(2)(A)); and battery of C.L. (count 9—§ 242)).[2] The jury found true with respect to count 1 that defendant personally inflicted great bodily injury on E.M. under circumstances involving domestic violence. (§ 12022.7, subd. (e).) The jury also found true aggravating circumstances with respect to counts 1, 4, and 5/6. In a bifurcated proceeding, the court found true the aggravating circumstance that defendant had served a prior prison term. Additionally, the court found true that defendant had a prior serious felony conviction (§ 667, subd. (a)(1)) that also qualified as a prior strike conviction (§§ 667, subds. (b)-(i), 1170.12).

The trial court sentenced defendant to an aggregate term of 25 years four months: 18 years for count 1 (the upper term of four years doubled for the prior strike plus five years for the great bodily injury enhancement and five years for the prior serious felony), a consecutive term of 16 months (one-third the middle term doubled) on count 4, and a consecutive term of 6 years on count 5/6 (double the middle term). The court imposed concurrent terms on the remaining counts, all of which were misdemeanors.

## I. BACKGROUND

E.M. was in a long-distance relationship with defendant in 2022. On the evening of May 12, 2022, E.M. sent defendant a text message explaining she did not want to break her lease to move to Sacramento. E.M. testified that defendant called her and screamed at her. He called her derogatory names and told her that he deserved to be told this information in person. Later that evening, E.M. went to a soccer game with C.L. and told him about the situation. She returned home at about 10:30 p.m. Defendant arrived at E.M.'s house at around 2:30 in the morning. He entered by using his key. E.M. was lying in her bed.

---

[2] The jury found defendant not guilty of assault with a deadly weapon on E.M. (count 2—§ 245, subd. (a)(1)) and making criminal threats against E.M. (count 3—§ 422).

E.M. testified that defendant pled with her to move in with him and then said he was moving in with her if she did not move in with him. E.M. asked him to leave. He fell onto her, put his hands on her neck, and strangled her. E.M. lost consciousness and defecated herself. When she regained consciousness, E.M. could not stand up because her leg was numb. Defendant dragged E.M. to the kitchen to get a bag of frozen vegetables to hold on her neck, and then dragged her back to the bedroom.

E.M. testified that when she looked at her phone on the side table, defendant flung the phone and her Apple watch off the table and asked her who she thought she was going to call. Next, defendant picked up E.M.'s phone and watch and put them in his pocket. He made sure all the doors were locked and closed all the blinds. E.M. asked defendant if he was going to kill her. He replied, "[I]f I kill you, it has to look like an accident." Then he smothered E.M.'s face with a pillow and said, "it was probably going to be just like that." E.M. testified she could barely breathe. She tried to yank the pillow off her face because her breathing was very shallow. The pillow was on her face for several seconds.

E.M. testified defendant double-checked that the windows and curtains were closed, turned off the lights, and got into bed with her. She tried to get out of bed, but defendant wrapped his arms around her so she could not move. She tried to fight to get away from him, but defendant said to stop fighting him, so she did. After defendant fell asleep, E.M. tried to move again. She fell off the bed and landed between the wall and the mattress. Defendant saw her on the ground and told her to stay there, so she stayed there for the rest of the night.

E.M. testified that defendant woke up at 11:00 a.m. and told her they needed to get up and get ready. She grabbed clothes out of her closet, but defendant did not want her to wear what she had chosen, so he picked out clothes for her. Before E.M. went into the shower, defendant said that if she told anyone about what he did, he would "torpedo her family." Defendant explained this meant he would "send a hit man out and hurt [her]

3

family." E.M. shut the door to the bathroom, but defendant opened it and said, "we don't want closed doors in this house." He watched her shower. After she showered, E.M. did her hair and makeup because defendant said he wanted her to. Defendant made her breakfast and then watched her eat it. Each time E.M. said she wanted defendant to leave, defendant would hit the table or the wall next to the table and get in her face and yell at her. After breakfast, defendant had E.M. administer his medicine to him. He said, "I'm so glad that I have you forever to do this for me." E.M. started crying.

E.M. testified that defendant sat on the couch next to her and made her cuddle with him. He put a blanket around her. E.M. further explained she did not try leaving the house because defendant said she was not allowed to leave, and she was afraid to try.

C.L. testified that, at the soccer game, E.M. told him she had broken off communication with defendant and he was driving up to talk to her. E.M. told C.L. she was scared because defendant said she did not get to make these decisions by herself. The next day, C.L. texted E.M. throughout the day and she did not respond. C.L. drove past her work and did not see her there. C.L. drove past her house and could see defendant was there. C.L. told E.B. to check on E.M.

E.M. testified that she saw E.B. walk up to the door. Defendant answered the door. E.B. asked if E.M. was there and defendant slammed the door. Defendant asked who E.B. was. E.M. said she did not know, but E.B. might be there for the clothes she was selling. Defendant opened the door again. E.M. asked E.B. if she was there for the clothes she was selling, and E.B. replied affirmatively. Defendant let E.B. in. Defendant stayed with the women as they picked out clothes. E.B. asked if there was a bag to put the clothes in. E.M. went to the laundry room to get a bag, and defendant followed her. E.M. dropped bags on the floor because she hoped defendant would stay and clean them up. When she went back to the bedroom, he was not behind her and E.M. whispered to E.B. that she needed help. E.B. asked E.M. to help carry the bags to the car. E.M. followed E.B. to the car while defendant stayed on the porch. E.B. whispered to E.M. to

get in the car. E.M. waited until E.B. was on the other side of the car, and got in and closed the door. Defendant got to the car quickly, opened the door, and tried to pull E.M. out by her arm. E.B. was on top of E.M., keeping her in the car. When E.B. threatened to call law enforcement, defendant let go and said, "please, don't do this to us, baby." E.B. drove to C.L.'s house.

C.L. testified that E.B. texted him for help while she was at E.M.'s house. C.L. called 911 on his way to the house. When he arrived, E.B. and E.M. had already left, and defendant ran toward C.L.'s truck and punched the window. Defendant stuck his fingers inside and ripped the window out. Defendant came through the back of the truck and punched C.L. in the head. C.L. hit the gas and made a sharp turn that caused defendant to fly out of the back of the truck.

A police officer for the City of Redding was dispatched to C.L.'s house where he spoke to C.L., E.M., and E.B. The officer testified that E.M. had light bruising and a red circular abrasion on her neck. E.M. testified that she told the officer about the choking, but did not indicate she had defecated herself. She explained she did not give the officer every detail of what happened the first time he talked to her. She later sent him an email with additional details about the day.

Defendant's statements to law enforcement were admitted at trial. Defendant told law enforcement that he drove to E.M.'s house to talk after their breakup. Before he left the next day, one of E.M.'s clients showed up at the house and was acting strangely. E.M. got in the client's car and left. Defendant denied being violent with E.M. or taking her phone. He said he took her watch by mistake. Defendant said C.L. hit him with his truck while C.L. was backing it up. Defendant grabbed the side of the truck and the window broke.

Dr. Shaw testified as an expert in strangulation. Dr. Shaw explained that during an act of strangulation, blood vessels and arteries in the neck "are being compressed or pushed on or closed off, preventing the oxygen from getting to the brain," or "the trachea

5

or windpipe, if that is closed off, then there's not oxygen getting directly to the brain, so any combination or isolation of those vessels or all of those structures . . . can cause what . . . happens when somebody is strangled." If the vessels or airways are blocked, a person can lose consciousness within five to 10 seconds. After 30 seconds, a person can lose control of their bowels and defecate themselves.

Dr. Shaw examined E.M. on July 7, 2022. E.M. still had neck pain. E.M. reported to Dr. Shaw that she had been strangled, had lost consciousness, and when she regained consciousness, she had defecated herself. E.M. also described numbness and tingling in her leg when she regained consciousness. Dr. Shaw opined that E.M. had been strangled for at least 30 seconds and suffered a traumatic brain injury.

The defense called J.B. as a witness. J.B. testified that he was in a relationship with E.M. in 2019. Shortly after their relationship ended, he and E.M. got into an altercation at a bar. E.M. accused J.B. of physically assaulting her, which he denied. E.M. also filed a restraining order against J.B. J.B. testified that E.M. falsely accused him of being a drug dealer. J.B. testified that he considered E.M. a deceitful person.

## II. DISCUSSION

### A.    Unanimity

The court gave a unanimity instruction with respect to the charge that defendant had made criminal threats (count 3). Defendant argues the trial court had a sua sponte duty to instruct the jury as to unanimity on counts 1, 4, and 5/6 as well.

We review de novo a claim that the trial court was required to give a unanimity instruction. (*People v. Sorden* (2021) 65 Cal.App.5th 582, 616.)

The jury in a criminal case "must agree unanimously the defendant is guilty of a *specific* crime." (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) Thus, "[a]s a general rule, when violation of a criminal statute is charged and the evidence establishes several acts, any one of which could constitute the crime charged, either the state must select the particular act upon which it relied for the allegation of the information, or the jury must

6

be instructed that it must agree unanimously upon which act to base a verdict of guilty. [Citation.] There are, however, several exceptions to this rule. For example, no unanimity instruction is required if the case falls within the continuous-course-of-conduct exception, which arises 'when the acts are so closely connected in time as to form part of one transaction' [citation], or 'when . . . the statute contemplates a continuous course of conduct or a series of acts over a period of time.' " (*People v. Jennings* (2010) 50 Cal.4th 616, 679.)

      *1.    Count 1*

Defendant argues the trial court had a sua sponte duty to instruct on unanimity with respect to count 1, because the victim alleged two distinguishable violations of section 273.5, subdivision (a), by testifying that: (1) she was strangled, and (2) defendant suffocated her with a pillow. Defendant argues a reasonable juror could have inferred the latter either caused or contributed to the injuries "reported to the prosecution's expert witness." This assertion is based in part on the expert testimony that "[d]uring an act of strangulation . . . the blood vessels in the neck, so these arteries, . . . are being compressed or pushed on or closed off, preventing the oxygen from getting to the brain. [¶] The other way is the trachea or windpipe, if that is closed off, then there's not oxygen getting directly to the brain, so any combination or isolation of those vessels or all of those structures can . . . cause . . . what happens when somebody is strangled."

The trial court instructed the jury:

"The defendant is charged in Count 1 with inflicting an injury on someone with whom he had, or previously had, a dating relationship that resulted in a traumatic condition in violation of . . . section 273.5[, subdivision ](a).

"To prove that the defendant is guilty of this crime, the People must prove that:

"1. The defendant willfully inflicted a physical injury on someone with whom he had, or previously had, a dating relationship[];

"AND

7

"2. The injury inflicted by the defendant resulted in a traumatic condition."

The court further instructed the jury that "[the] defendant is charged in Count 2 with assault with a deadly weapon other than a firearm, to wit, a pillow, in violation of . . . section 245[, subdivision ](a)(1)."

Defendant notes that in discussing the instructions outside the presence of the jury, the prosecutor stated, "I believe the [section] 273.5 can happen by either the strangulation or by the pillow, but the [great bodily injury] is not the pillow."

No unanimity instruction was required because the prosecution elected strangulation as the relevant act for count 1. "The prosecution can make an election by 'tying each specific count to specific criminal acts elicited from the victims' testimony'— typically in opening statement and/or closing argument. [Citations.] Such an election removes the need for a unanimity instruction." (*People v. Brown* (2017) 11 Cal.App.5th 332, 341.) During closing argument, the prosecutor informed the jury that count 1 "has to do with the strangulation."[3] Defendant argues this was not sufficient to communicate the election to the jury under *People v. Melhado* (1998) 60 Cal.App.4th 1529. His reliance on *Melhado* is misplaced. There, the defendant was charged with making a threat to commit a crime that would result in death or great bodily injury. (*Id*. at p. 1532.) The defendant visited an auto repair shop at 9:00 a.m. and then again at 11:00 a.m., making threats each visit and carrying what appeared to be an operable grenade during the second visit. (*Id*. at p. 1533.) He was arrested during his third visit, at 4:30 p.m. (*Ibid*.) Outside the jury's presence, the prosecutor elected to rely on the 11:00 a.m. threat. (*Id*. at p. 1535.) During closing argument, the prosecutor emphasized the 11:00 a.m. incident, but discussed the other visits as well. (*Id*. at pp. 1535-1536.) The appellate court concluded it was error for the judge not to give a unanimity instruction because the

---

[3] Likewise, the prosecutor explained count 2 was when defendant smothered E.M. with the pillow.

8

prosecutor did not directly inform the jurors of his election. (*Id*. at p. 1536.) Here, the prosecutor told the jury of the People's election and appropriately focused the jury on only the relevant facts. In its discussion of count 1, the prosecutor focused exclusively on the strangulation and never mentioned the suffocation with the pillow. No unanimity instruction was required with respect to count 1.

2. *Count 4*

Defendant argues the trial court had a sua sponte duty to instruct the jury as to unanimity on count 4 because the victim alleged at least three clearly distinguishable acts that elevated the offense from misdemeanor false imprisonment to felony false imprisonment by violence: (1) strangulation, (2) suffocation with a pillow, and (3) that defendant said if E.M. told anyone what she did, he would "torpedo" or send a hitman to harm her family. This argument is unavailing because the continuous course of conduct exception can apply to either form of false imprisonment. As set forth above, this exception applies " 'when . . . the statute contemplates a continuous course of conduct or a series of acts over a period of time.' " (*People v. Jennings, supra*, 50 Cal.4th at p. 679.)

" 'False imprisonment is the unlawful violation of the personal liberty of another.' (§ 236.) The offense rises to the level of a felony when 'effected by violence, menace, fraud, or deceit.' (§ 237, subd. (a).)" (*People v. Whitmore* (2022) 80 Cal.App.5th 116, 130.)

The jury was instructed with respect to count 4 that the People had to prove:

"1. The defendant intentionally confined or detained someone by violence or menace;

"AND

"2. The defendant made the other person stay or go somewhere against that person's will."

The jury was further instructed that:

9

"*Violence* means using physical force that is greater than the force reasonably necessary to restrain someone.

"*Menace* means a verbal or physical threat of harm, including use of a deadly weapon. The threat of harm may be express or implied."

During closing argument, the prosecutor argued count 4 was based on "[E.M.] is not free to leave the house." Specifically, "[h]e's got her phone, he's got her Apple iWatch, and he has done violent acts towards her, right? He has strangled her to unconsciousness. He is . . . threatening to kill her and . . . her family. She is not free to leave, right? He has made threats against her." The prosecutor noted that when E.M. tried to leave, defendant ran out, pried open the car door, and grabbed her by the arm to prevent her from leaving. The prosecutor concluded, "that's false imprisonment. He kept her at the house. She wasn't free to leave. He took her phone. When she tried to leave, he ran after her and he grabbed her."

We agree with the People that sections 236 and 237 contemplate a continuous course of conduct, and defendant's actions were a single false imprisonment. Defendant concedes there was one misdemeanor false imprisonment under section 236 that constituted a continuous course of conduct, but argues there were multiple discrete and separate acts that could have elevated the offense to a felony under section 237. Defendant, however, fails to set forth any authority permitting us to parse felony false imprisonment this way. Moreover, his argument does not follow. Because false imprisonment covers conduct that can occur over a period of time, the additional and unnecessary force required for felony false imprison may also arise from multiple acts. (See *People v. Whitmore, supra*, 80 Cal.App.5th at p. 130 [" 'The additional force required for felony false imprisonment, as opposed to misdemeanor false imprisonment, may come in the form . . . of simply pulling a victim toward a location when the victim's liberty has already been violated. . . . [Citation.] [S]uch additional and unnecessary force may also arise from sexual assaults suffered by the victim during the course of the

10

defendant's contact with the victim' "].)  Further, the prosecutor argued a course of conduct theory.  (See *People v. Gunn* (1987) 197 Cal.App.3d 408, 416 ["The continuous conduct aspect of the exception to the general rule applies in this case because . . . section 32 contemplates conduct which can occur either in an instant or over a course of time, and the prosecutor charged and argued the case as a continuous crime rather than as a series of separate, culpable acts"].)  The continuous course of conduct exception applies to count 4.

Additionally, the People are correct that the jury was not required to unanimously agree on the theory of violence or menace.  "[U]nanimity as to exactly how the crime was committed is not required.  Thus, the unanimity instruction is appropriate 'when conviction on a single count could be based on two or more discrete criminal events,' but not 'where multiple theories or acts may form the basis of a guilty verdict on one discrete criminal event.' "  (*People v. Russo, supra*, 25 Cal.4th at p. 1135.)  "In deciding whether to give [a unanimity] instruction, the trial court must ask whether (1) there is a risk the jury may divide on two discrete crimes and not agree on any particular crime, or (2) the evidence merely presents the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime.  In the first situation, but not the second, it should give the unanimity instruction."  (*Ibid*.)  No unanimity instruction was required for count 4.

> 3.      *Count 5/6*

Defendant was convicted of dissuading a witness from reporting a crime (count 5—§ 136.1, subd. (b)(1)) and dissuading a witness from reporting a crime by force or threat (count 6—§ 136.1, subd. (c)(1)).  Though charged as separate counts, the jury was instructed on count 6 as an additional finding it was required to make only if it found

defendant guilty of dissuading a witness from reporting a crime as charged in count 5.[4] (See *People v. Brenner* (1992) 5 Cal.App.4th 335, 340-341 [witness intimidation under § 136, subd. (b)(1) is a lesser included offense of a violation of § 136, subd. (c)(1)].) The court therefore treated these counts as one count for sentencing purposes. Defendant argues the trial court had a sua sponte duty to give a unanimity instruction for count 6. He contends there were four distinct allegations that could have constituted the basis for defendant's conviction for count 6: (1) defendant strangled E.M., (2) defendant suffocated E.M. with a pillow, (3) defendant took her phone and watch, and (4) defendant said if she told anyone what he did, he would "torpedo" her family. As with count 4, this argument fails based on the continuous nature of the offense.

_____

[4] The jury was instructed that to prove defendant guilty of intimidating a witness as charged in count 5, the People had to prove:

"1. The defendant tried to prevent or discourage and/or prevented or discouraged E.M. from making a report that she was a victim of a crime to law enforcement;

"2. E.M. was a crime victim;

"AND

"3. The defendant knew he was trying to prevent or discourage and/or was preventing or discouraging E.M. from making a report that she was a victim of a crime to law enforcement, and intended to do so."

With respect to count 6, the jury was instructed:

"If you find the defendant guilty of intimidating a witness, you must then decide whether the People have proved the additional allegation that the defendant used or threatened to use force. [¶] To prove this allegation, the People must prove that:

"1. The defendant acted maliciously;

"AND

"2. The defendant used force or threatened, either directly or indirectly, to use force or violence on the person or property of a victim."

"The language of section 136.1 focuses on an unlawful goal or effect, the prevention of testimony, rather than on any particular action taken to produce that end. 'Prevent' and 'dissuade' denote conduct which can occur over a period of time as well as instantaneously. The gravamen of the offense is the cumulative outcome of any number of acts, any one of which alone might not be criminal. Thus it falls within the continuous conduct exception, and no election or unanimity instruction [is] required." (*People v. Salvato* (1991) 234 Cal.App.3d 872, 883.) The greater offense is no different. (See *ibid.* ["Salvato argues that the reference to 'the act' in subdivision (c)(1) of section 136.1 indicates an intent to punish individual acts alone. In this context, however, it appears 'act' was used synonymously with 'offense,' referring to whatever conduct was employed to dissuade or prevent a witness's testimony"].)

Accordingly, the prosecutor argued a single crime of witness dissuasion based on a continuing course of conduct:

"So one, . . . he strangles her, right? He takes her phone. She can't get the phone. He then -and this is going to go into other accounts [*sic*], right? She says, are you going to kill me? He says, it's got to look like an accident, right?

"He then gets the pillow, and he pushes it down onto her face, and . . . he closes the blinds and locks up the house, right? This is also preventing her from contacting law enforcement.

"He's not only just preventing her from contacting law enforcement, she can't get her phone. This isn't (inaudible) wireless device dissuading, right? But she can't leave the house to contact law enforcement. He's . . . strangled her, and then he's done this thing with the pillow. It's got to look like an accident.

"Those are, right, two violent acts of what can be done to her if she tries to leave, right? You heard [w]hen E[.]B[.] came in that he was . . . being very aggressive, very aggressive. His hands clenched here, and that she was scared.

13

"He's using force, the threat of force, that what she's reasonably been include [*sic*], okay? He just strangled me to the point of [un]consciousness and . . . put this . . . pillow over my face. That's going to happen to me if I try to get my phone, that's what's going to happen if I try to report it and try to get out of here.

"So that's . . . the threat of force. So that . . . you know directly or indirectly. So that's this. This is he is using force to prevent her from contacting law enforcement, and the fear of force from her contacting law enforcement."

As with count 4, no unanimity instruction was required with respect to count 5/6 because the offense was based on a continuing course of conduct and the jury was not required to unanimously agree on the precise manner in which defendant committed this single crime.

B.      *Section 654*

Defendant argues the trial court was required to stay the punishment on two of counts 1, 4, and 6 pursuant to section 654. Additionally, defendant argues the trial court was required to stay the punishment on either count 5/6 or count 7 pursuant to section 654. We disagree.

Section 654, subdivision (a) provides, in relevant part: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision."

"Whether a defendant may be subjected to multiple punishment under section 654 requires a two-step inquiry, because the statutory reference to an 'act or omission' may include not only a discrete physical act but also a course of conduct encompassing several acts pursued with a single objective. [Citations.] We first consider if the different crimes were completed by a 'single physical act.' [Citation.] If so, the defendant may not be punished more than once for that act. Only if we conclude that the case involves more than a single act—i.e., a course of conduct—do we then consider whether that course of

14

conduct reflects a single ' "intent and objective" ' or multiple intents and objectives." (*People v. Corpening* (2016) 2 Cal.5th 307, 311.)

"A trial court's express or implied determination that two crimes were separate, involving separate objectives, must be upheld on appeal if supported by substantial evidence." (*People v. Brents* (2012) 53 Cal.4th 599, 618.)

The trial court explained that "concerning Counts 1 and 4 through 7, then 8 through 9, the Court finds each count was related to a separate and distinct act. [¶] Count 1 and Count 4 through 7 occurred separately over the course of several hours as testified to by the victim. There was sufficient time to contemplate each act. Thus, I find it to have been easily divisible conduct. None of these acts were necessary to accompany the other, nor did one facilitate the other. As such, no execution of sentence need to be stayed under [section] 654."

### 1. Counts 1, 4, and 6

Defendant argues the trial court was required to stay the punishment on two of counts 1, 4, and 6 pursuant to section 654. With respect to the first step of our inquiry, defendant argues it is possible his convictions for willful infliction of corporal injury resulting in a traumatic condition on a current or former dating partner (count 1), false imprisonment by violence or menace (count 4), and dissuading a witness from reporting a crime by force or threat (count 6), were all based on the same act—his strangulation of E.M. Defendant notes that he was found not guilty of assault with a deadly weapon (count 2) and making criminal threats against E.M. (count 3), and argues that although this does not necessarily mean he did not suffocate or threaten E.M., "it does make it much more likely that the jury convicted [defendant] on counts 1, 4, and 6 because it found that [defendant] had strangled [E.M]."

"Whether a defendant will be found to have committed a single physical act for purposes of section 654 depends on whether some action the defendant is charged with having taken separately completes the actus reus for each of the relevant criminal

15

offenses." (*People v. Corpening, supra*, 2 Cal.5th at p. 313.) That was not the case here. Count 1 was based on the strangulation. But count 4, as previously discussed, was based on a continuous course of conduct that included preventing E.M. from leaving her house through force and explicit and implicit threats of harm. Likewise, count 6 was based on a continuous course of conduct that included taking E.M.'s phone so she could not report the strangulation to law enforcement.

Because the counts involve more than a single act, we now to turn to the second step of our inquiry. (*People v. Corpening, supra*, 2 Cal.5th at p. 311.) Where "the defendant had multiple or simultaneous objectives, independent of and not merely incidental to each other, the defendant may be punished for each violation committed in pursuit of each objective even though the violations share common acts or were parts of an otherwise indivisible course of conduct." (*People v. Cleveland* (2001) 87 Cal.App.4th 263, 267-268.)

Substantial evidence supports the conclusion that defendant had a distinct objective for each count. As to count 1, defendant strangled E.M. early on in his visit after they had been arguing about her ending their relationship. Substantial evidence supports the conclusion defendant's objective was to hurt E.M. for ending the relationship. In contrast, defendant's objective in falsely imprisoning E.M. (count 4) was to prevent her from leaving her house. His comments after she administered his medicine indicate he no longer believed the relationship was over. Substantial evidence supports the finding that defendant's objective with respect to count 6 was to prevent E.M. from reporting his actions to law enforcement. Because substantial evidence supports the conclusion that defendant had multiple objectives, the court was not required to stay the punishment for counts 1, 4, or 6.

2. *Counts 5/6 and 7*

Defendant argues the trial court was required to stay the punishment on either count 5/6 (dissuading a witness from reporting a crime by force or threat) or count 7

(interference with a wireless communication device) pursuant to section 654 because both convictions were based on the jury's finding that he confiscated E.M.'s phone and watch. Count 5/6 was not satisfied by taking the phone alone because the People were required to show defendant dissuaded E.M. through force or threat. (§ 136.1, subd. (c)(1).) As set forth above, the prosecution argued this was accomplished based on more than just taking E.M.'s phone, including the strangulation, various statements defendant made, and his aggressive behavior. Count 6 therefore included additional acts not covered in count 7.

We agree with the People that while the counts involve overlapping acts committed in a course of conduct, substantial evidence supports the conclusion that defendant had a different objective for each count. Defendant offers no meaningful response to this assertion. As to count 6, defendant's intent was to prevent E.M. from reporting the fact he strangled her to law enforcement. As to count 7, defendant's objective was to prevent E.M. from contacting others while he tried to extend their relationship. Defendant asked E.M. who she was intending to call, which supports the conclusion he did not want her to contact either law enforcement to report the abuse or a friend or family member to help her leave him. The trial court was not required to stay punishment for counts 5/6 or 7.

## III.  DISPOSITION

The judgment is affirmed.

/S/

_____

RENNER, Acting P. J.

We concur:

/S/

_____

MESIWALA, J.

/S/

_____

FEINBERG, J.